448 So.2d 676 (1984)
STATE of Louisiana
v.
Raymond CAPTVILLE.
No. 82-KA-2206.
Supreme Court of Louisiana.
February 27, 1984.
Rehearing Denied March 23, 1984.
*677 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Nathan Stansbury, Dist. Atty., Louis G. Garrot, Asst. Dist. Atty., for plaintiff-appellee.
Anthony J. Fontana, Jr., Abbeville, for defendant-appellant.
LEMMON, Justice.
This is an appeal from a conviction of manslaughter. The only issue is the sufficiency of the evidence.
Facts
On the evening of June 9, 1981, Miriam Boudreaux was killed by a gunshot while she and defendant were alone in the apartment that they shared. The weapon from which the shot was fired was a .38 caliber derringer belonging to defendant. She and defendant had been living together for three years, although defendant was still married. Ms. Boudreaux was pregnant at the time of her death.
Defendant testified at trial that he and Ms. Boudreaux had spent an uneventful evening. They had been seriously discussing the prospect of marriage after he obtained a divorce from his wife and had looked at wedding rings earlier that day (a fact confirmed by the owner of the jewelry store). After eating dinner, they went out to watch a ballgame and then returned to their apartment to watch television. Defendant further testified that he brought the derringer from his car into the apartment and placed it on the coffee table. After the couple went to bed, Ms. Boudreaux asked if he had moved the gun from the coffee table, whereupon she got out of bed and headed for the living room. Moments later, defendant heard two noises in rapid succession, the second being a gunshot. He ran to the living room to find Ms. Boudreaux standing with her arms over her head. According to defendant, she appeared to have been shot, and she began to move toward him. He laid her down on the floor and told her not to move. When he attempted to place a pillow under her head, he knocked a picture of his son off the top of the television set. He threw the picture across the room and placed the pillow under her head. Clad only in a T-shirt and gym shorts, he ran across the hall to the apartment of his neighbor, John Williams.
Williams testified that he heard a loud noise and that defendant pounded on his door about 45 seconds later, asking him to call the police and an ambulance. Williams rushed to defendant's apartment, where he found Ms. Boudreaux lying on the living room floor, dressed only in a short nightgown. She was bleeding from her nose and mouth, but was still breathing. Williams then rushed back across the hall to his apartment to obtain some towels. When he returned some 10 to 15 seconds later, he noticed that defendant appeared to be changing clothes. He also saw, for the first time, a chrome-plated derringer with a pearl handle on the floor, about two feet from Ms. Boudreaux's body. Williams was certain that the pistol had not been there seconds earlier when he first saw her body. By the time a member of the police force arrived a few minutes later, Ms. Boudreaux was dead.
Expert evidence established that the fatal shot had been fired from a distance of at least two and one-half to three feet from Ms. Boudreaux's body. The bullet entered her body 50 inches above her heel and lodged in her back at a point 50¾ inches above her heel. The relationship between the entry wound and the location of the slug (including the path of the bullet) suggested that the weapon which fired the fatal shot must have discharged when pointing at a right angle to the frontal plane of Ms. Boudreaux's upright body, that is, that the muzzle was "pointed" directly *678 at her. The bullet entered her body in the upper left side of her chest and passed through her heart, aorta and lungs before lodging against her back. Due to the severity of the injuries caused by the bullet's path through vital organs, the autopsy surgeon estimated that death must have occurred within about 10 minutes and unconsciousness within about four minutes.
Testing of swabs of defendant's hands and Ms. Boudreaux's hands to determine the presence of gunpowder residue was inconclusive.
Defendant was arrested and indicted for second degree murder. La.R.S. 14:30.1. A jury convicted him of the responsive offense of manslaughter.
Standard of Appellate Review
In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). That standard, which was adopted by the Legislature in enacting La.C.Cr.P. Art. 821 pertaining to postverdict motions for acquittal based on insufficiency of evidence, is that the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.[1]
A defendant is entitled to have the trial judge instruct the jurors that the evidence must satisfy them that defendant's guilt has been proved beyond a reasonable doubt and that they must give defendant the benefit of every reasonable doubt arising from the evidence or the lack of evidence. La.C.Cr.P. Art. 804 A. In cases involving circumstantial evidence, a defendant is additionally entitled under the provisions of La.R.S. 15:438 (formerly Article 438 of the 1928 Code of Criminal Procedure) to have the trial judge instruct the jurors that they must be satisfied the overall evidence "excludes every reasonable hypothesis of innocence".
Thus, a defendant has a statutory right to an instruction that the jurors must conclude that no reasonable hypothesis of innocence exists, as well as a constitutional (and statutory) right to appellate review of the record for sufficiency of the evidence. An appellate court reviewing the sufficiency of evidence must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime.[2] As stated by this court in State v. Chism, 436 So.2d 464, 470 (La.1983), La.R.S. 15:438 "may not establish a stricter standard of review than the more general reasonable juror's reasonable doubt formula, [but] it emphasizes the need for careful observance of the usual standard, and provides a helpful *679 methodology for its implementation in cases which hinge on the evaluation of circumstantial evidence".
Appellate Review in the Present Case
The circumstances clearly ruled out the possibility of suicide. Not only was there no evidence indicating that Ms. Boudreaux would have wanted to take her life, but also the physical evidence excluded the possibility that she shot herself. Further, defendant's own version of the events of the evening ruled out the possibility that an unidentified assailant may have inflicted the fatal wound. Thus, the jury was presented with only two theories of the homicide: the state's theory that defendant intentionally shot the victim and defendant's theory that the victim dropped the gun, causing it to discharge accidentally.
The jury's verdict of guilty of manslaughter obviously reflects a "compromise" between a verdict of guilty as charged (of an intentional and unprovoked killing) and a verdict of not guilty, which the jurors would have been required to return if they had believed defendant's totally exculpatory version. The verdict, whatever it reflects regarding defendant's state of mind, certainly reveals a plain rejection of defendant's "accidental discharge" theory. Nevertheless, while the jurors obviously rejected defendant's denial that he had handled the gun and found that defendant had fired the fatal shot (rather than that the gun discharged accidentally when she dropped it or knocked it over, which was the only apparent alternative theory), the manslaughter verdict does not necessarily reflect a finding that defendant acted with an intent to kill or inflict great bodily harm. The jurors could have returned this verdict based on a finding that defendant, while pointing the pistol at the victim intending to frighten her, accidentally shot her to death. See La.R.S. 14:31(2)(a) which defines manslaughter as an unintended killing during the perpetration of an assault. See also La.R.S. 14:36, 37 and 38.
The jury also apparently resolved against defendant the conflict in testimony as to the presence of the gun on the floor near the body when Williams first entered the apartment. The jurors must have concluded that defendant, after Williams left to retrieve towels, placed the derringer on the floor near Ms. Boudreaux's body. Once the jurors chose to credit Williams' emphatic statement that the gun was not there when he first entered the apartment, the only explanation for the subsequent presence of the pistol was that defendant put it there, since no one else was in the apartment except the dying woman.
The jurors also apparently concluded that Ms. Boudreaux was shot by someone who was pointing the pistol directly at her. That conclusion is reasonably supported by the evidence. The location of the entry wound and the path of the bullet are entirely consistent with a well-aimed shot directed toward vital areas of the victim's body. A crime laboratory expert did testify that the derringer could have discharged if it had been dropped directly on the "stem" (the tip of the hammer).[3] However, it is hardly a reasonable hypothesis that Ms. Boudreaux dropped the pistol hard enough on the carpeted floor so that it would have struck the exact point on its stem, causing it to discharge into her body, at the precise time that her body was bent over so that the bullet entered at a right angle to the frontal plane of her body. Moreover, the crime laboratory expert further testified that the pistol's falling and discharging would have made only one sound audible to the human earthe sound of the discharge. This contradicted defendant's trial testimony that he heard two sounds in very rapid sequence, the second being a discharge of the pistol.
Defendant argues, however, that the location of the bullet hole in the victim's nightgown (46 inches from her heel), in *680 relation to the location of the entry wound (50 inches from the heel), indicates an upward angle of travel, which is inconsistent with a conclusion that the bullet traveled at a right angle to the frontal plane of an upright body. However, the location of the hole in the garment was consistent with the location of the entry wound if Ms. Boudreaux had raised her hands instinctively in fright and shock as she faced a lethal weapon purposely pointed in her direction, causing the gown to rise up on her body. Moreover, if the gown was down in its regular position at the time of the shooting, the hole in the garment, four inches below the location of the entry wound and 4¾ inches below the location at which the bullet lodged in the victim's back, is totally inconsistent with any angle of travel.
The evidence that the pistol was not on the floor when Williams first entered the apartment and was there upon his return seconds later points unmistakably to defendant's having placed the gun near the body. Williams' testimony, coupled with defendant's adamant denial that he handled the gun, could have led the jurors to reasonably conclude that defendant put the gun next to the dying woman in an effort to support a concocted story of accidental discharge. The broken picture across the room was also indicative (although certainly not conclusive) of an argument or of violence.
Further, the jurors obviously (and reasonably) concluded that defendant's version of the events immediately preceding the fatal shot was a fabrication designed to deflect blame from him. His testimony that he did not move the gun and his testimony that he heard two noises (the second being a gunshot) in rapid sequence were discredited by other evidence. Under these circumstances, the jurors' conclusion that defendant was not testifying truthfully could reasonably support an inference that the "truth"if told by him as the only survivor of the two people in the apartmentwould have been unfavorable to his "accidental discharge" defense.[4]
When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. An evaluation of the reasonableness of other hypotheses of innocence provides a helpful methodology for determining the existence of a reasonable doubt. As we have recognized in such cases as State v. Wright, 445 So.2d 1198 (La.1983), State v. Graham, 422 So.2d 123 (La.1982), and State v. Sutton, 436 So.2d 471 (La.1983), the court does not determine whether another possible hypothesis has been suggested by defendant which could explain the events in an exculpatory fashion. Rather, the reviewing court evaluates the evidence in the light most favorable to the prosecution and determines whether the alternative hypothesis is sufficiently reasonable that a rational juror could not "have found proof of guilt beyond a reasonable doubt". Jackson v. Virginia, above.
The jury's verdict reflected a reasonable construction of the events of the evening based upon the evidence viewed in the light most favorable to the prosecution. The evidence clearly ruled out any theory of suicide or of a shooting by an intruder; the *681 jury reasonably rejected defendant's version of a discharge when the gun was dropped or knocked over; and there does not appear to be any other hypothesis which raises a reasonable doubt as to defendant's guilt. Thus, we cannot say that a rational juror could not have voted to convict.
Defendant's conviction and sentence are affirmed.
DIXON, C.J., concurs.
CALOGERO, J., concurs and assigns reasons.
CALOGERO, Justice, concurring.
Upon review, I find the evidence in this case sufficient to support a verdict of guilty as a matter of law both under La. R.S. 15:438 ["assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence"] and under the constitutional due process standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) [any rational trier of fact in viewing such evidence in the light most favorable to the prosecution must conclude that the state proved the essential elements of the crime beyond a reasonable doubt].
NOTES
[1] The Official Revision Comment to Article 821 clearly reveals the legislative intent to adopt the Jackson standard for both trial and appellate court review of sufficiency of evidence to sustain a jury verdict, when that verdict has been challenged by a motion for a postverdict judgment of acquittal.
[2] The Jackson standard is an objective standard for testing the overall evidence, direct and circumstantial, for reasonable doubt. See the special concurring opinion in United States v. Bell, 678 F.2d 547, 550 (5th Cir.1982), which states:

"To say that the evidence is sufficient if `a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt,' is not substantively different from saying that the evidence is sufficient if a reasonable trier of fact could find that the `evidence was inconsistent with every reasonable hypothesis of innocence.' United States v. Marx, 635 F.2d 436, 438 (5th Cir.1981). It is true that `[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt,' but it is equally true that if a hypothesis of innocence is sufficiently reasonable and sufficiently strong, then a reasonable trier of fact must necessarily entertain a reasonable doubt about guilt."
[3] This type of accidental discharge required a sharp blow and did not happen every time the expert dropped the derringer during his tests.
[4] Such a finding of purposeful misrepresentation reasonably raises the inference of a "guilty mind", just as in the case of "flight" following an offense or the case of a material misrepresentation of facts by a defendant following an offense. See State v. Davenport, 445 So.2d 1190 (La.1984). "Lying" has been recognized as indicative of an awareness of wrongdoing. See State v. Rault, 445 So.2d 1203 (La.1984), in which this court, in rejecting as unreasonable an asserted "hypothesis of innocence" (based on defendant's own statement), stated:

"The jury could have reasonably concluded that Rault concocted this version of the crime to hide his own guilt". 445 So.2d at 1213.
Any contrary implications in State v. Savoy, 418 So.2d 547 (La.1982), and State v. Shapiro, 431 So.2d 372 (La.1983), simply mean that such evidence, although admissible to support a "guilty mind", are not alone sufficient to convict.