458 So.2d 1024 (1984)
STATE of Louisiana, Plaintiff-Appellee,
v.
Felton LEDET, Defendant-Appellant.
No. CR84-31.
Court of Appeal of Louisiana, Third Circuit.
November 7, 1984.
Writ Denied February 4, 1985.
*1025 G. Paul Marx, Lafayette, for defendant-appellant.
Michael Harson, Asst. Dist. Atty., Lafayette, for plaintiff-appellee.
Before GUIDRY, STOKER and YELVERTON, JJ.
STOKER, Judge.
Defendant, Felton Ledet, appeals from his conviction of second degree murder arising out of the shooting death of Richard Mosby. Defendant was sentenced to a *1026 mandatory term of life imprisonment at hard labor. We affirm.

FACTS
On January 8, 1983, Richard Mosby was found dead in his parked car outside the Willow Lounge in Lafayette, Louisiana at approximately 3:15 a.m. by Harvey Benoit. The victim and Mr. Benoit had previously been drinking together inside the Willow Lounge. According to Mr. Benoit, the victim left the lounge approximately forty-five minutes before his body was discovered. At approximately 3:00 a.m. that same morning police had been in the lounge in answer to a call reporting the sound of gunshots. The body of the victim was not discovered at that time.
The evidence produced at trial shows that the victim was lying across the front seat of the car at the time he was shot. The shots were fired through the passenger's side window. The victim suffered wounds from three bullets, one of which entered the left side of the top of his head and lodged at the base of his brain. This injury was determined to have caused the victim's death. Four .25 caliber bullet cartridge casings were recovered at the scene, along with one bullet which had lodged in the arm rest of the victim's car. A bullet and bullet fragments were also recovered from the victim's body.
Officer Charles Johnson of the Lafayette Police Department testified that during the investigation a black male approached him, identified himself as a Pinkerton security guard and asked if he could be of any help. This individual was later identified as the defendant. Officer Johnson also testified that the defendant remained at the scene and had to be asked by other officers to move back.
During the investigation Officer Johnson noticed a vehicle described as a white Chevrolet Suburban. He testified that the vehicle was moved several times during the course of the investigation. At approximately 5:00 a.m. a wrecker began towing the victim's car to the police impound yard. While following the wrecker, Officer Johnson noticed that the white Suburban was following him. He radioed police headquarters requesting that another unit stop and identify the individual in the white Suburban. Officer Ken Guidry responded to the request, and after following the defendant for a short distance, stopped him for a traffic violation. In response to Officer Guidry's request the defendant got out of his vehicle and walked to the rear of it. Officer Guidry asked that he produce a driver's license and conducted a pat-down search. The officer then conducted a visual search of the inside of the vehicle and saw a holster lying on the front seat which appeared to be made for a small caliber weapon.
The defendant agreed to accompany Officer Guidry to the police station, and drove his own vehicle there. Although he was not under arrest, the defendant was informed of his constitutional rights at the police station before being questioned regarding the holster in his vehicle. Upon being questioned the defendant admitted he had a .25 caliber gun at his home and consented to a police search to recover the gun. At his home, the defendant directed the officers to his bedroom and indicated that the pistol was under a pillow on his bed. After this first search, the defendant voluntarily submitted to an atomic absorption test, a procedure designed to determine whether the subject of the test has recently been in contact with a firearm which has been discharged. The defendant was placed under arrest around 9:30 a.m., and at approximately 11:25 a.m. he consented to a second search of his home which was for the purpose of seizing clothing and swabs which had been used to clean a gun.
Expert testimony at trial established that the weapon seized at the defendant's home was the same weapon used in the murder. The results of the atomic absorption test indicated that defendant had in fact been in contact with gun residue which is released upon the discharge of a firearm. This gun residue is made up primarily of barium and antimony. The test results showed levels of these elements sufficiently high on both *1027 of defendant's palms to indicate a positive result; however, the levels of the elements on the backs of his hands were inconclusive.
After deliberating approximately an hour and a half the jury voted ten to two in favor of conviction. Defendant appeals making the following assignments of error:
"I. The judgment of conviction is contrary to law because the circumstancial (sic) evidence presented failed to exclude every reasonable hypothesis of innocence.
"II. The trial court erred in its failure to suppress evidence seized from the defendant.
"III. The trial court erred in limiting the defense to eight peremptory challenges, under the new law for jury trials, despite the fact that this prosecution was instituted prior to the effective date of that legislation."

ASSIGNMENT OF ERROR NO. I.
By this assignment, defendant argues that the State did not present sufficient evidence to sustain its conviction of second degree murder. The basis of this argument is that every reasonable hypothesis of innocence was not excluded as required by LSA-R.S. 15:438 which provides:
"The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."
The standard of review as to sufficiency of the evidence to support a conviction is whether the evidence, viewed in the light most favorable to the prosecution, is sufficient to convince a rational trier of fact that all elements of the crime have been proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In a case such as this involving circumstantial evidence, the defendant is entitled to have the jury instructed that the evidence must exclude every reasonable hypothesis of innocence. State v. Captville, 448 So.2d 676 (La.1984). In regard to the correct standard of appellate review in cases involving circumstantial evidence, the Louisiana Supreme Court has most recently made the following statement in State v. Chism, 436 So.2d 464 (La.1983):
"Although the circumstantial evidence rule may not establish a stricter standard of review than the more general reasonable juror's reasonable doubt formula, it emphasizes the need for careful observance of the usual standard, and provides a helpful methodology for its implementation in cases which hinge on the evaluation of circumstantial evidence."
The above statement by the court in Chism was reiterated in State v. Captville, supra. The court in Captville was reviewing a case involving circumstantial evidence in which the jury apparently rejected defendant's hypothesis of innocence. The court in Captville held:
"When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt."
In our attempt to apply what appear to be the latest expressions of our State's highest court regarding standards of review in cases involving circumstantial evidence, we will review the evidence relied upon by the State. The evidence presented at trial showed that the defendant lived approximately one block from the Willow Lounge. A neighbor, whose home is roughly positioned between the lounge and defendant's home, testified that around 3:00 a.m. he heard a sound similar to gun fire, and shortly thereafter heard noises indicating that someone was running from the direction of the Willow Lounge toward Georgia Street where defendant's home is located.
The defendant exhibited an inordinate amount of interest during the investigation of the crime, and was observed following the truck towing the victim's car to the impound yard. (It is highly probable that *1028 defendant would not have been arrested had he not continued to make himself so conspicuous.) The shell casings and bullets which were recovered were established by expert testimony to have been fired from defendant's gun. The defendant had gun residue on his hands consistent with having recently been in contact with a discharged firearm. The defendant was able to lead the police directly to the location of his gun. According to his own testimony, the defendant apparently had opportunity to commit the crime.
The defendant testified that he spent the most of the late evening of January 7 working on his truck. Around midnight he decided to go to the Willow Lounge for a beer. After his first beer at the Willow Lounge, defendant proceeded to two other nearby bars, apparently looking for female companionship. He returned to the Willow Lounge shortly after 1 o'clock and became engaged in a conversation with a lady there. Because he was still wearing the clothing in which he had worked on his truck, the defendant decided he should go home and change into clothing more appropriate for continuing, to use his words, "the night's episode." After changing clothes, the defendant purchased some gasoline and three beers and returned to the Willow Lounge at approximately 2 o'clock. The lady with whom he had spoken earlier was no longer there, and after buying drinks for a group of four or five more ladies, the defendant left alone. The defendant testified that he drove around for a short time and then drove back by the Willow Lounge, at which time he was informed that the lounge was closed. The defendant went home, drank another beer, and was trying to decide how to spend the rest of his night out. He noticed a number of emergency lights in the vicinity of the Willow Lounge and decided to go over and see what had happened.
Defendant's hypothesis of innocence is that someone else used his gun in the shooting and returned it to its place under his pillow. In support of this position, defendant points out that the police were aware of another person sleeping in his house when they seized his gun early on the morning of January 8. The police did not wake or question the person sleeping in the house. Defendant testified that his younger brother lives with him in the house. There were also a number of people in the house when the police returned later to seize the gun cleaning patches, yet none of these people were questioned. According to defendant, he had last fired his weapon on Wednesday before the Saturday shooting, and he had cleaned the gun late Thursday night. His explanation for the gun residue on his hands is that it came either from the holster in his truck, or the cleaning patches left in his room. We note that the gun was quite evidently cleaned after being used in this shooting.
As in State v. Captville, supra, the jury apparently considered defendant's hypothesis that someone else had used his gun in the shooting and rejected it. No other hypothesis of innocence, either possible or reasonable, has been suggested by the defendant. In viewing the evidence in the light most favorable to the prosecution, the jury could have reasonably concluded that the defendant committed the crime, returned home and cleaned his gun, and returned to the scene of the crime to follow the investigation. Defendant's position that some unknown person used his weapon to commit the murder was reasonably rejected by the jury, and there has been no other hypothesis which would raise a reasonable doubt as to his guilt. We cannot say that a rational juror could not have voted to convict.

ASSIGNMENT OF ERROR NO. II.
Defendant argues that the trial court erred in denying his motion to suppress the holster, the gun, the empty cartridge case, and the cleaning swabs. We will first consider the admissibility of the holster which was seized pursuant to defendant's stop for a traffic violation.
Defendant argues that the search of his vehicle was unreasonable because at that point there was no reason to suspect him of *1029 any involvement in any crime. We disagree. Officer Guidry initially began following defendant's vehicle after being informed that it was following the murder victim's car which was being towed to the police impound yard. Officer Guidry followed the defendant's vehicle until he witnessed a traffic violation which was, to the best of his recollection, improper lane usage. Officer Guidry testified that he looked into the vehicle for his own safety in order to ascertain that there was no one else in the vehicle, and saw the holster laying on the front seat. He recognized that the holster was probably made for a small caliber gun, and he knew at that point that the weapon used in the murder was a .25 caliber pistol.
The defendant testified that he does not recall committing any traffic violation; however, we do not find that the trial court abused its discretion in accepting Officer Guidry's testimony over that of the defendant. We have no difficulty in concluding that Officer Guidry was justified in looking into the defendant's vehicle for his own protection, and that his inadvertent observation of the holster did not amount to an intrusion sufficient to justify constitutional protection. See State v. McGary, 397 So.2d 1305 (La.1981) and State v. Parker, 355 So.2d 900 (La.1978). We must now consider whether exigent circumstances existed which justified seizure of the holster. State v. Redfearn, 441 So.2d 200 (La.1983).
The exact circumstances of the seizure of the holster are a little unclear. Officer Guidry testified that he did not seize the holster; however, Detective Broussard testified that Officer Guidry handed the holster to him when the defendant arrived at the police station. According to the defendant, it was seized immediately after he was given the traffic citation, but not by the officer who issued the citation. We conclude that the holster was properly seized at the time the traffic citation was issued. The facts within Officer Guidry's knowledge at the time he stopped the defendant were sufficient to give him probable cause to believe that the holster was evidence in the earlier murder. The defendant had agreed to return to the police station and was allowed to drive his own vehicle there; therefore, he would have had an opportunity to remove the holster. These circumstances warranted immediate action.
We will now consider the seizure of the gun, empty cartridge case, and cleaning swabs. These items were seized from defendant's home pursuant to two signed consents to search by the defendant. Defendant argues that his consent was not voluntarily given. According to the police, defendant arrived at the police station at approximately 5:15 a.m. He signed a waiver of rights at 5:25 a.m. and a voluntary consent to search at 6:01. They proceeded with the defendant to his home, at which time they seized the gun and empty cartridge case. When they returned to the station, defendant voluntarily submitted to the atomic absorption test, and he was placed under arrest at approximately 9:30 a.m. Defendant signed another voluntary consent to search at 11:25 a.m., after which the police returned to his home and seized the gun cleaning swabs. The defendant's testimony is that he did sign the consent forms but that he did so after the first search. He also testified that he felt he might be a subject of police brutality if he did not cooperate.
Voluntariness is a question of fact to be determined by the trial judge under the facts and circumstances of each case. The factual determinations of the trial judge are given great weight on appellate review. State v. Smith, 433 So.2d 688 (La.1983). It is clear that the trial judge found the testimony of the police officers more credible than that of the defendant, and we cannot say that he abused his discretion in doing so.
The motion to suppress was correctly denied.

ASSIGNMENT OF ERROR NO. III.
In this assignment, defendant argues that the trial court erred in applying *1030 to his case Act 495 of 1983 amending LSA-C.Cr.P. art. 799. Act 495 reduces the number of peremptory challenges available to the State and the defendant from twelve to eight. Its effective date was August 30, 1983, prior to defendant's trial which began on October 11, 1983. Although it is not articulated in this matter, it is apparent that defendant argues that Act 495 was unconstitutionally applied to his trial in an ex post facto manner. This court has recently considered that argument and found it to be without merit. See State v. Floyd, 458 So.2d 597 (La.App. 3d Cir.1984). In that case we discussed the jurisprudence and concluded that a change in the number of peremptory challenges is merely procedural and may have retroactive effect without violating the constitutional prohibition against ex post facto laws. We conclude in the case before us, as we did in Floyd, that the change in the number of peremptory challenges did not materially impair the right of this defendant to have his guilt determined according to the law as it existed when the offense was committed or when prosecution was instituted. Act 495 was properly applied.

DECREE
For the above reasons, the defendant's conviction for second degree murder is affirmed.
AFFIRMED.