LABORDE, Judge.
On September 15, 1986, defendant, Sanders Parks Tyner, Jr., was found guilty of second degree murder, a violation of LSA-R.S. 14:30.1. On September 25, 1986, defendant filed a motion for post-verdict judgment of acquittal. The trial court denied defendant’s motion on October 2,1986. Defendant was sentenced to serve a term of life imprisonment without benefit of probation, parole or suspension of sentence. Defendant appeals his conviction based on three assignments of error. Defendant has failed to brief his first assignment of error. It is therefore considered abandoned. State v. Dewey, 408 So.2d 1255 (La.1982).
FACTS
In the early morning hours of January 25, 1986, Scott Henry, “T-Boy” McCall and Nelson Guillory were present at T-Boy McCall’s dock located along the Cameron River in Cameron Parish. A gunshot was heard coming out of the northwest in an area where several barges were docked. Minutes later another shot was heard. Soon thereafter, they heard an outboard motor revving in the distance. Within minutes Murl Racca, Jr. appeared in a boat going full speed until it pulled up to T-Boy McCall’s dock. Racca, dripping with blood, hurriedly climbed out of the boat and stated to those present that he had just been shot by Sandy Tyner, defendant. The victim further declared that he was badly hurt. Scott Henry and Braxton Blake helped transport Racca to the hospital. On the way to the hospital, Racca again told those in the vehicle that he did not think that he was “going to make it,” and that “Sandy did it ... I don’t know why.” T-Boy McCall testified that after Racca was transported to the hospital, he called the sheriff’s office to report the shooting.
Racca lost consciousness shortly before his arrival at the hospital; attempts to revive him were futile. The Coroner of Cameron Parish, Dr. Cecil W. Clark, determined that Racca died of exsanguination and internal bleeding, secondary to shotgun pellet penetration. The autopsy revealed five projectile wounds to the decedent’s back, one in the scalp, two in the back of the right forearm, and one in the back of the right hip.
Meanwhile, defendant, Sanders Tyner, had also called the sheriff’s office and asked to be picked up at a specified dock so that he might give a statement. Officer Daniel Lavern of the Cameron Parish Sheriff’s Department met defendant at the requested dock. Defendant approached Officer Lavern and immediately and voluntarily exclaimed to the officer that he had just *1007 shot Murl Racca. Defendant explained that Murl had attempted to take a shrimping barge belonging to defendant. Defendant was taken to the police station and was subsequently arrested for second degree murder.
At the police station, defendant was read his Miranda warnings, signed a waiver of rights form, and gave a statement to the police. In the statement, defendant gave no indication that he shot at Racca in self-defense.
At trial, defendant testified that he believed that he had bought full ownership of the barge from Tommy Jordan on behalf of a third party. Defendant claimed that he bought the barge for $1,200, of which $600 was paid in cash and $600 was still owed. Defendant testified that he had no knowledge of the victim’s proprietary interest in the barge.
Defendant stated that on the day of the shooting, the victim, Murl Racca, arrived at defendant’s houseboat and told defendant that he planned to take the shrimping barge. Defendant told Murl that he could either pay for it or that he would have to leave it. Defendant testified that Racca intended to buy the barge from him. Defendant maintained that he had no idea that Racca believed that he owned a half interest in the barge.
Defendant testified that Racca then went to the barge and started cutting the mooring lines. At this time, the two were about 40 feet away from one another — -the victim standing on the open deck, the defendant standing behind the cabin. Defendant stated that he armed himself with a shotgun from the cabin. Defendant observed some sort of a stainless steel weapon on Racca’s left side; so defendant fired a “warning shot” into Racca’s back. Racca then turned towards the defendant. Defendant testified that someone then shot him from behind; however, no evidence of this was discovered. Defendant then fired another shot towards Racca. Murl left after defendant fired the second shot.[1]
*1008 Tommy Jordan testified on behalf of the defendant. Mr. Jordan, the original owner of the barge, testified that he sold Murl Racca a one-half interest in the barge in the spring of 1985. Sometime later, Mr. Jordan offered to sell his remaining interest to Murl Racca. Mr. Racca could not come up with the money so Mr. Jordan sold his remaining one-half interest to defendant. Mr. Jordan testified that he never specifically told defendant that he was only buying a one-half interest in the barge, but he assumed that defendant knew this as it was customary in the area to sell percentages of ownership in vessels. Mr. Jordan also testified that he was authorized to sell Murl Racca’s one-half interest to the defendant, but since the defendant had enough money to pay for just one-half of the barge, Mr. Jordan sold defendant only Mr. Jordan’s one-half interest.
Defendant claims that he did not know that he had shot Racca and that before Mr. Racca started to cut the lines, defendant “begged” Mr. Racca several times not to take the boat. Defendant testified that several months before the killing, Mr. Rac-ca and others intentionally rammed and sunk a boat defendant was piloting. However, on cross-examination, defendant admitted that the collision occurred at night, that his boat had no running lights on, and that the Racca boat returned to determine if defendant was injured.
Upon immediate investigation, the police found no knives or other weapons in the boat which Murl Racca captained on the day in question. A week later, the boat’s owner, Tommy Thompson, found a knife in the boat. Defendant, however, testified that this knife was not the same knife he believed Murl Racca had on the day of the shooting. Additionally, the prosecution pointed out, through the testimony of Deputy Donald Benoit of the Cameron Parish Sheriff’s Department, that the mooring lines attached to the barge did not appear to be cut. Deputy Benoit testified that when he confronted defendant with the uncut rope, defendant stated that he really did not see Racca with a knife.
ASSIGNMENT OF ERRORS NOS. 2 AND 3
Defendant contends that the trial court erred in denying his motion for a post-verdict judgment of acquittal and, in conjunction therewith, that under the guidelines set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the circumstantial evidence failed to prove defendant’s guilt of every element of the crime of second degree murder beyond a reasonable doubt.
Defendant argues that the circumstantial evidence failed to prove beyond a reasonable doubt that defendant had the requisite specific intent to kill or inflict great bodily harm. Additionally, defendant claims the state failed to sufficiently prove that defendant failed to act in self-defense.
Specific intent is defined in LSA-R.S. 14:10 as “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.”
Specific intent is a state of mind which need not be proven as fact, but may be inferred from circumstances of transaction and actions of the defendant. State v. Latiolais, 453 So.2d 1266 (La.App. 3d Cir.), writ denied, 458 So.2d 125 (La.1984).
When defendant claims he had to kill in self-defense, the state has the burden of proving beyond a reasonable doubt that defendant did not act in self-defense. State v. Martin, 458 So.2d 454 (La.1984).
LSA-R.S. 15:438 provides the rule as to circumstantial evidence: “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.”
The standard of review under Jackson is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found *1009 all of the essential elements of the crime proven beyond a reasonable doubt. State v. Chism, 436 So.2d 464 (La.1983). The statutory test for determining the sufficiency of the circumstantial evidence, requiring evidence to exclude every reasonable hypothesis of innocence is not separate from the Jackson standard. Ultimately, all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that defendant is guilty beyond a reasonable doubt. State v. Porretto, 468 So.2d 1142 (La.1985).
When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defendant’s testimony, that hypothesis fails and defendant is guilty unless there is another hypothesis which raises reasonable doubt. State v. Captville, 448 So.2d 676 (La.1984); State v. Ledet, 458 So.2d 1024 (La.App. 3d Cir.1984), writ denied, 462 So.2d 1263 (La.1985).
After viewing the circumstantial evidence in the light most favorable to the prosecution, it appears that the state presented sufficient evidence to allow a rational trier of fact to conclude that defendant had the requisite specific intent to kill or to inflict great bodily harm. Defendant admitted to firing twice at the victim. See State v. Boyer, 406 So.2d 143, 150 (La.1981), wherein the court stated that “[i]t can be inferred from the fact that the defendant shot Mrs. Sandoz [the victim] in the head at close range that he actively desired her death to follow his act.” The relationship between defendant and the victim had not been amicable in the past. Defendant’s claim that the victim was attempting to take his shrimping barge was impeached when the lines were shown not to have been cut. Additionally, defendant claimed he had been shot at from behind, yet three witnesses nearby testified that only two gunshots were heard during this time period, the two shots that the defendant admitted firing. Neither the gun nor the knife allegedly used by the victim was found. Defendant’s claim of self-defense was rejected by the trier of fact. Defendant, in his initial statement to the police, failed to even mention his belief that the victim held a weapon. Defendant’s narration of the events rebuts the reasonableness of the self-defense theory in that he shot Racca in the back with a shotgun while the two were over 35 feet apart. Under Captville, 448 So.2d at 680, the jury could reasonably reject defendant’s hypothesis of only intending warning shots or acting in self-defense based on the circumstantial evidence shown by the state.
This court is therefore required to hold defendant guilty unless another hypothesis has been raised. Defendant has not raised another hypothesis of innocence. Defendant’s conviction is supported by the evidence. Defendant’s motion for a post verdict judgment of acquittal was properly denied.
As defendant’s assignments of error have no merit, and no errors patent on the face of the record have been found, the conviction and sentence of defendant are affirmed.
AFFIRMED.
FORET, J., dissents with reasons.

. Defendant’s narration of the events, as transcribed at trial, can be found below:
"A Okay. When he saw me set that shotgun down, well, he just kind of grinned at me. He picked his foot back up and got back up on the barge, and he turned around and went for the bow line. That was the only line holding ... I did have a secondary hidden line; he didn’t know it. So, anyway ... That was just in case they cut them loose at night; they’d come through there and cut them all loose; and I had one line just as a safety, you know. So, he went for that bow line, and ... (Pause)
******
A (Continuing) So, anyway, that's when he went for the bow line. That was the main line holding the whole thing together. And I hollered at him. I was ... I was ... I was begging to him.
Q Begging him?
A Not to ... not to do any more. So, at that time, well, I wear a 45 on my left. And Murl had carried a gun. I didn’t know whose it was. I had seen them with so many guns. So, Murl went across with his left. I grabbed the shotgun; I throwed it over the roof; and I looked down the barrel. And Murl just kind of stopped for an instant, and at that time he started to spin. And I could see stainless steel. I didn’t know what it was. I know it wasn't no knife. I didn’t think it was. Because I know how to draw a left. I draw a left fast. I don’t wear a gun on my right. And he come with his left, and I knew I was gone. I fired a warning shot. I saw the flash when he flashed, you know. When you Hash, that’s when you go for a gun or a weapon. It comes out quick. He didn’t stop when I fired the warning shot. Instead he started to spin, and at that time I pumped the shotgun again, and something hit me. I didn’t know what it was. I couldn’t find no blood or nothing. I leaned forward over the cabin, and when I did I pumped the shotgun again, and I fired it, apparently. I didn't hear no sound, but I did feel the recoil. So, I slumped over, and I fell back on the deck. I didn’t know what it was. I stayed down I don’t know how long; maybe, you know, a few seconds, maybe a minute; I don’t know. I got up; I looked around. I looked back over behind me. I thought the shot come back there, you know.
Q You thought what?
A I thought somebody shot at me from back there. So, I got up, I looked around, I couldn’t see nobody. I looked back up, and Murl was standing up on the bow; and he cóme back around the side; and he come over to the far side and looked over at T-Boy’s camp, kind of north-northwest ... northeast of the river. So ...
Q Did he say anything?
A No, Murl didn't say nothing at that time. He had done ... He'd shut up, you know. So, he walked across the deck, he looked, and he turned and come back around, and he got back on the boat. I didn’t say a word, either. I was trying to find out what all was going on. So, he got back in that boat of Tommy's, and *1008 he headed north. And I got in my little boat, and I headed down towards McDaniel’s dock down there to call the sheriffs department.”