KING, Judge.
William David Buxton, (hereinafter the juvenile), thirteen years of age, was adjudicated a delinquent child by the district court exercising juvenile jurisdiction, for the second degree murder of his father, Ronald E. Buxton. On disposition, the juvenile was committed to the custody of the Louisiana Department of Public Safety and Corrections until he reaches twenty-one years of age. The juvenile appeals based on four assignments of error. Assignments of error numbers 1 and 4 were not briefed and are considered abandoned. State v. Dewey, 408 So.2d 1255 (La.1982).
FACTS
On June 24, 1986, the victim, Ronald Buxton, was killed by two shotgun blasts at close range. Before being shot twice with a shotgun, he had been shot seven times by a .25 caliber pistol. There were no witnesses to the crime. The case against the juvenile was based upon circumstantial evidence. The juvenile testified at the adjudication hearing, as did a number of police officers, relatives and friends.
The juvenile lived alone with his father in a trailer on Old River Road which is west of Highway 109 in Starks, Calcasieu Parish, Louisiana. The juvenile testified that he left the trailer briefly, with his father asleep on a chair, not long before midnight, and that upon his return, he found his father lying face down on the floor, dead. The juvenile maintains that someone else must have entered the trailer during his absence and shot his father. The juvenile was convicted because all of the circumstances pointed to him, and shortly before his father’s death he had talked to three friends at different times about killing his father and about his inheritance rights if he killed his father.
The juvenile related at trial the events on the day of his father’s death. He said the two of them went on a picnic during the day and then worked outside. After finishing working they had a water fight and the juvenile got wet. Late that afternoon they did some shooting with their guns. For supper they peeled shrimp and his father cooked. The juvenile told one of the first arriving police officers that at about 10:30 that night he left his father asleep on a reclining chair and walked to Dandy Dan’s, a half a mile away, to get a Coke. He was nearly there when he realized he did not have any money, and returned to the trailer to find his father lying on the floor, dead and “full of holes”. There was blood everywhere. The juvenile related that the first thing he did, after finding his father dead, was to go and take his dad’s shotgun out of its case and put the case on the bed, get some shotgun shells out of his dad’s vest, and load the gun and go outside and shoot it one time, because he “... was mad and didn’t know what was going on”. He then stated he reloaded the shotgun and laid it down beside his father. At some point afterwards, the juvenile took one of *616 the cushions from the couch and tried to wash the blood out of it with Shout cleanser in the shower stall. He telephoned his cousin Robert and told him his dad was dead, and asked him to come to the trailer but not to tell anybody. The reason the juvenile said why he told Robert not to tell anybody was because Robert “... talks to everybody and he mouths off”. When the juvenile’s aunt and uncle (Robert’s parents) came and got the juvenile and took him back to their house, he had blood all over him so they made him take a shower and change clothes. The juvenile admitted that he had talked about killing his dad with friends but he said he was just joking.
The first officers to arrive at the scene, seeing the 20-gauge shotgun lying on the floor parallel to the body, thought it was a suicide. The victim’s wallet was on the bed in the bedroom with money in it. Later investigation proved suicide impossible.
Pathology proved that the victim died from the first of two shotgun wounds to the head. There were seven additional wounds to the body made by a small caliber handgun. None of these — four in the torso, one in the left wrist, one beneath the chin, and one in the right cheek — would have been fatal. There was evidence that after receiving the seven handgun shots, the victim got up and in a probably disoriented state, walked about the room. There was blood on the bottom of the victims’ feet and his blood was on the floor in various places. A forensic pathologist, Dr. Charles Odom, testified for the State. On the basis of the pathological evidence and the testimony, noting that the last time the victim was alive was when he was lying down on a recliner chair on his back, this doctor described the probable sequence of events as follows:
“In summary, I think that this individual sustained his injuries in a sequence which began with handgun wounds while he was, at first, lying face up in the recliner. Sustained a series of handgun wounds. In my opinion, the first was probably the one in the anterior chest, precardial[sic] region, and the last of those seven was the wound to the cheek. He then got out of the recliner and moved about the area in the living room ' there; the blood dripping on the floor and the blood on the heater vent is indicative of that. Some of the blood in the front of the couch may be indicative of that. He certainly was up and about; he had blood on the bottom of his feet. At a time later — how much later, I can’t say ... minutes with these. He then received a shotgun blast to his right cheek area, when he was standing in front of the recliner facing a kitchen. That shotgun blast carried particles of blood and brain over towards the couch, and the blood spatter landed on the curtain. He collapsed at that point; and then received a second shotgun blast inflicted to his right temporal region.”
When the juvenile’s aunt and uncle came to get him, they found him soaking wet and he had blood in his hair and on his pants. The police found blood and tissue and skull fragments on the floor, and in the shower stall, in the bathtub, and on the commode. The juvenile’s tennis shoes, which he said he had not been wearing, were found wet and bloody in the sink. In their search for guns, the police were directed by the juvenile to a .25 caliber pistol in a locked suitcase in the victim’s bedroom. The police discovered a set of keys in the bathroom, one of which opened the suitcase. Ballistics tests run on this pistol showed that it was the pistol that fired the seven handgun projectiles that were recovered, four in the body and three outside the body.
The juvenile presented an expert, Dr. Milton Altschuler, who testified that the juvenile did not present the typical psychological profile of an adolescent guilty of patricide, and he did not think the youth could have committed such a crime. The State presented an expert, Dr. Harris Cox, a psychiatrist, who did not agree'with Dr. Altschuler’s ultimate conclusion. Dr. Cox testified that “there’s no such thing as some sort of psychiatric litmus test that you can give, that will say whether someone is innocent or guilty of a crime.”
FIRST ASSIGNMENT OF ERROR
The juvenile contends the trial court erred in its conclusion of guilt because the *617 circumstantial evidence did not exclude every reasonable hypothesis of innocence. The State’s case consisted mainly of circumstantial evidence. The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. La.R.S. 15:438.
When reviewing a conviction based on circumstantial evidence, it must be determined when viewing the evidence in the light most favorable to the prosecution, that a rational trier of fact could have concluded beyond a reasonable doubt that every reasonable hypothesis of innocence has been excluded. State v. Austin, 399 So.2d 158, 160 (La.1981).
The actions of the juvenile after the crime was committed were such that one could conclude beyond a reasonable doubt that he was attempting to cover up the crime.
Additionally, the juvenile presented an hypothesis of innocence to the trier of fact which was rejected. “When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defendant’s own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.” State v. Captville, 448 So.2d 676 (La.1984); State v. Ledet, 458 So.2d 1024 (La.App. 3rd Cir.1984), writ den. 462 So.2d 1263 (La.1985). In this case, the trial judge made a credibility determination that, based on the evidence presented, the juvenile’s version of the events of the night were not the truth. Credibility determinations are functions of the trier of fact and will not be disturbed on appellate review in the absence of manifest error. State v. Miller, 495 So.2d 422, 426 (La.App. 3rd Cir.1986).
The juvenile presented his hypothesis of innocence to the trial judge and it was rejected. No other reasonable hypothesis of innocence was presented. Accordingly, this assignment of error lacks merit.
SECOND ASSIGNMENT OF ERROR
By this assignment, the juvenile contends that the trial court erred in denying his request for a jury trial. A juvenile does not have the right to a jury trial during the adjudication of a charge of delinquency based upon acts that would constitute a crime if engaged in by an adult. State in Interest of Dino, 359 So.2d 586, 598 (La.1978), writ den. 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978); McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971). The trial court did not err in denying the juvenile’s request for a jury trial. This assignment of error lacks merit.
For the foregoing reasons, the adjudication of the juvenile as a delinquent child is affirmed.
AFFIRMED.