|, VICTORY, J *
We granted this writ to determine whether the court of appeal erred in reversing defendant Howard Cohn’s conviction upon a finding that the state failed to prove that the defendant “knowingly fail[ed] to apply the money received as necessary to settle claims for material and labor due for the construction or under the contract” under La. R.S. 14:202(A). After reviewing the record and the applicable law, we reverse the judgment of the court of appeal and remand the case to the court of appeal for consideration of defendant’s remaining assignments of error pretermit-ted on original appeal.
FACTS AND PROCEDURAL HISTORY
In the spring of 1993, after obtaining plans and specifications for the construction of a home in Mandeville, Louisiana, Douglas Broussard accepted a bid of $220,000 from Felix Trahan. Trahan made the bid on behalf of TCM, Inc., a corporation he formed with Anthony Mula and defendant Howard Cohn for the purpose of building the Broussard home. Trahan was president of TCM, Mula was vice president, and Cohn was secretary/treasurer. On June 10, 1993, Brous-sard gave Trahan a check in the amount of $6,000.00 as a deposit for the first phase of construction. Broussard obtained financing from Gulf Coast Bank for a total of $229,000.00, of which $15,000.00 was for the purchase of the lot and $214,000.00 | ?for construction of his home. On August 11, 1993, he entered into a contract with TCM, calling for completion of the home in six months.[1]
From the outset, the project, which was placed under defendant Cohn’s supervision, lagged well behind its projected six-month schedule and encountered numerous errors in construction. In fact, by February of 1994, Broussard prevailed on Trahan to have Cohn removed as the site supervisor and threatened to have Cohn arrested if he stepped back on the site. After hiring an interim supervisor for a month, TCM brought in Morris Marx, who was a friend of Cohn’s, at the beginning of April, 1994, to oversee the project. Marx was paid $600.00 per week for approximately three months.
On November 1, 1993, Robert Jamison entered into a contract with TCM for the construction of a home in a rural area north of Blond, Louisiana, calling for completion of the home in six months. Jami-son gave TCM a down payment of $10,000.00 and financed $94,000.00 with the Parish National Bank. As with the Brous-sard project, Jamison’s project, also under Cohn’s supervision, lagged behind from the outset and contained numerous construction errors. On February 18, 1994, Jamison made the first of four draws against his construction loan and distributed the funds to TCM.
Under increasing pressure from both prospective home owners to complete their homes, TCM paid off outstanding balances *1272 on some of its accounts before purchasing over $60,000.00 of additional construction materials in the months of March, April, and May of 1994 to finish both jobs. By April of 1994, Broussard had become personally involved in the distribution of draws of the Gulf Coast loan. Jamison learned that materials were not being paid for during construction and, after making the fourth payment from his loan to TCM, grew increasingly apprehensive following a conversation with Cohn who informed him that TCM was in financial crisis and needed more money. Cohn also advised Parish National of TCM’s|3financial problems and the bank began making the draw checks out directly to the suppliers of the construction materials.
On May 13, 1994, Broussard’s attorney sent TCM a “punch list” of nearly 60 items which needed immediate attention. The list was attached to a letter informing TCM that Broussard would exercise his rights under the contract and take control of the site by the end of the month. Cohn called Broussard about the letter and informed him that he was bankrupt and that his money, held in his wife’s name, was “untouchable.” Broussard seized his construction site at the end of May, 1994, barring TCM from the property. By May 3, 1994, $181,390 had been paid out under the contract on Broussard’s original loan. At the end of May, TCM, already fired from the Broussard project, informed Ja-mison through Morris Marx that it was quitting his site. Jamison drove out to his site and discovered that materials he had seen on the premises only two days before Marx’s call were missing. Jamison had paid TCM a total of $81,489.00, including his original $10,000.00 deposit. Both homes were approximately 85% complete at the time TCM stopped working on the projects.
To finish his house, Broussard used the last draw from Gulf Coast of $32,000 and $4,000 out of his own pocket, entering into a separate contract with his architect to supervise the work. In June, Broussard met with Cohn, Trahan and Mula after their arrests on a complaint filed by Jami-son. According to Broussard, Mula informed him that “as soon as we handle the Jamison situation, we’re going to get you your money because your money is in the Jamison job.” One month after the meeting with TCM’s officers, after receiving no further word from TCM and after TCM placed a lien against his home for $74,000.00, Broussard filed a criminal complaint against TCM. In addition to the $74,000.00 TCM lien, $36,671.57 in liens were filed against the Broussard property arising out of the bills incurred by TCM in March, April and May of 1994.
To finish his house, Jamison spent $13,636.00, $3,000 of which came out of his own pocket, and a combination of his own labor and the labor of friends. Jamison also faced a lien by TCM for $54,000.00, in addition to $32,794.15 in liens Rfor other materials and labor supplied to TCM. Many of the liens on both sites were canceled for technical reasons, but in the end, Broussard paid $14,000, and Jamison $10,000, to discharge the remaining claims against their properties for labor and materials furnished TCM.
Trahan, Mula, and defendant Cohn were charged with two counts of violating La. R.S. 14:202(A), under which a contractor who has received funds under a construction contract commits a criminal offense if he “knowingly fail[s] to apply the money received as necessary to settle claims for material and labor due for the construction or under the contract.” La. R.S. 14:202(A). At trial, the state introduced *1273 the canceled checks written by TCM’s officers on the corporation’s account maintained at the Hibernia National Bank in New Orleans. The state also introduced a computer printout of the activity in that account from October, 1993 to June, 1994, listing the credits and debits on both jobs, with a separate column for unallocated debits, i.e., checks written on the account which failed to specify whether they were for the Jamison or Broussard projects. The state referred to this printout as its “data base.”
This evidence showed that TCM had no assets or capital of its own and its account with Hibernia therefore relied entirely on the money provided by Broussard and Ja-mison personally, and by Gulf Coast Bank and First Parish Bank on the construction loans. With regard to the initial check for $6,000.00 written by Broussard to cover the first phase of construction, Mula testified that the three officers of TCM had split the check, taking $2,000 each to cover their start-up costs.[2]
The state’s “data base” also showed that by November 16, 1993, or less than a month after the deposit of the first draw of $44,000.00 from Gulf Coast on the Brous-sard project, the allocated and unallocated checks written against the account totaled $44,106.66, or more than the initial deposit of the first draw from Gulf UCoast. Three days later, TCM deposited Jamison’s check for $10,000 and thereafter continued to make payments for materials and labor on the Broussard site. The only money in TCM’s account, however, was the money supplied by Jamison for his home and by December 31, 1993, TCM had written checks far exceeding that amount when it deposited a second draw of $34,022.82 from Gulf Coast on Broussard’s- construction loan. Work on the Jamison project did not begin until mid-January of 1994, when the first bill for a permit to begin construction work on the Jamison job was paid. Evidence showed that the $10,500 paid for the Jamison job was already spent on behalf of the Broussard project. It is only after the deposit of that second draw from Gulf Coast that the state’s data base shows payments for materials on the Jamison site. The state alleged that this trend of using funds from one project to pay the bills for the other continued throughout the jobs. Broussard testified that whenever he expressed his concern that the house was not progressing according to schedule, both Cohn and Mula advised him that his “money was on the Jamison job,” and that things would progress once the Jamison job was finished.
The data base also showed that as late as April, 1994, TCM continued to pay Cohn supervision fees for the Broussard site as well as the Jamison site, although TCM had removed Cohn from the Brous-sard site in February of that year. The data base also showed that beginning in April, 1994, Mula began receiving supervision fees for the Jamison site, although TCM continued to pay Cohn to supervise the site at the rate of between $300.00 and $750.00 per week. TCM always paid its officers’ “supervisory” fees on a weekly *1274 basis without delay. Further supervision fees were paid to Morris Marx,[3] including $3,500.00 to obtain a building permit for TCM, as only Marx was a licensed general contractor. TCM also paid Marx additional supervision fees of $4,800.00.
|fiThe data base further reflected payments on items which are inconsistent with construction claims and which the state argued were related to other bills not associated with either Jamison or Broussard’s project.[4]
Finally, the evidence showed that by May 16, 1994, TCM had written checks in the amount of $237,612.55 against deposits of $240.215.77, but had purchased $60,000 worth of materials for which it had yet to pay any amount. At that point, TCM could look forward to the final draws from both construction loans of approximately $55,000.00, and even after that, more labor and supplies would be needed to complete both houses.
Trahan and Mula testified at trial, flatly denying any criminal intent and attributing TCM’s financial crisis to bad weather, difficult site preparation, and frequent upgrades made by both Broussard and Jami-son on various items which quickly led to shortages on the anticipated costs of construction. In addition, Mula testified that Broussard had misunderstood his remarks during the June, 1994 meeting, and that Mula had intended to convey that TCM was willing to use any profit it realized on the Jamison contract to help with the shortages that had occurred on his project.
The jury acquitted Trahan and Mula, but found Cohn guilty on both counts, one for each project, of misapplication of contract funds and specifically determined that the amount misapplied on both counts exceeded $10,000.00. La. R.S. 14:202(A). The trial court sentenced Cohn to concurrent terms of three years imprisonment at hard labor, suspended the sentences, and placed him on probation with the condition that he make restitution to the victims.
On appeal, the First Circuit reversed defendant’s convictions and sentences on grounds that the state had failed to prove its case under the due process standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). State v. Cohn, 99-0248 (La.App. 1 Cir. 11/5/99), 759 So.2d 341 (unpublished opinion). The court of appeal acknowledged that the evidence introduced at trial “clearly demonstrated that TCM and Anthony Mula, Richard Trahan, and Howard Cohn contracted to build the homes of Douglas Broussard and Robert Jamison” and that the men had “received sums of money during the building process for payment on labor and materials.” Id., 99-0248, p. 5. However, as to the question of whether the state had proved a knowing misapplication of the funds received from Broussard and Jamison, the court of appeal held that the *1275 evidence at trial did not exclude the reasonable hypothesis of innocence “that the costs could have been significantly underestimated, that delays and unexpected problems or changes in construction caused extra expenses, and that the defendants were disorganized and inept.” Id. at p. 7. We granted the state’s writ. State v. Cohn, 00-0313 (La.9/22/00), 767 So.2d 709.
DISCUSSION
In reviewing the sufficiency to support a conviction, the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. State v. Captville, 448 So.2d 676, 678 (La.1984). Misapplication of payments by a contractor is prohibited under La. R.S. 14:202, which provides, in pertinent part:
A. No person, contractor, subcontractor, or agent of a contractor or subcontractor, who has received money on account of a contract for the construction, erection, or repair of a building, structure, or other improvement, including contracts and mortgages for interim financing, shall knowingly fail to apply the money received as necessary to settle claims for material and labor due for the construction or under the contract.
As stated by the court of appeal, the essential elements of the crime are: (1) the existence of a contract to construct, erect, or repair a building, structure, or other improvement; (2) the receipt of money on the contract; and (3) a knowing failure to apply the money received as necessary to settle claims for material and labor due under the contract.
IsThe court of appeal, after acknowledging the scarcity of cases decided under this statute, relied on the case of State v. Weems, 596 So.2d 358 (La.App. 2 Cir.1992), to find that the state failed to meets its burden of proving the “knowing misapplication of funds” by Cohn. State v. Cohn, at 7. In Weems, the court found that evidence that the contractor was paid $40,000 to build a chicken house but that one supplier was not paid was insufficient to support a conviction under La. R.S. 14:202. Weems, supra. The court held that “[a]s long as the contractor applies all the money he receives from the owner to the labor and material bills he incurs on the owner’s job, he is not criminally responsible under the statute, even if the amount received is insufficient to discharge all the bills.” Id. at 360. The court further stated that “[w]hen the state relies on circumstantial evidence to prove an element of its case, the evidence must exclude every reasonable hypothesis of innocence.” Id. In Weems, one reasonable hypothesis was that the contractor had misapplied some of the contract money, but there were other reasonable hypotheses which were not excluded, such as underestimating the costs for labor and materials, construction delays that may have increased such costs beyond the amount received, or other cost overruns.
We agree with the Second Circuit in Weems that the statute requires more than simply proof that a contractor has left unpaid claims for materials and labor at the end of a construction contract. The statute clearly does not criminalize a bad business deal made by a contractor who otherwise applies all of the funds received under the contract for legitimate expenses and claims for materials and labor in the course of the project, although he cannot *1276 pay all of them because, for one reason or another, the project has exceeded its estimated costs.
However, the instant case is distinguishable from Weems in several important respects. First, the state in this case presented direct evidence in the form of bank records and the state’s “data base” to prove that suppliers were not paid because TCM did not apply all the money it received from the each owner to the labor and material bills it incurred on each respective owner’s job. Second, in this case there were two victims and the bank records clearly show that money from one victim |swas being used to settle claims belonging to another victim and vice versa, and that in the end, materialmen from both jobs were not paid. Finally, there were numerous materialmen liens filed in this case, whereas in Weems there was only one. The existence of these factors was sufficient to convince a rational trier of fact that Cohn, as the treasurer of TCM, knowingly failed to apply the money received under each contract as necessary to settle claims for material and labor due under each contract.
We are further unpersuaded by Cohn’s argument that he should be acquitted because Muía and Trahan were acquitted. The acquittals of Muía and Trahan on the same evidence may have reflected jury lenity or its assessment that as the secretary/treasurer of the corporation who dealt directly with suppliers and as the wayward supervisor of both sites, Cohn bore chief responsibility for the failure of TCM to pay its bills as they became due. See State v. Irvine, 535 So.2d 365, 369 (La.1988) (“[A] court, reviewing the sufficiency of the evidence in a joint trial of two alleged principals in which one was convicted and one was acquitted, generally should not be concerned with possible inconsistencies in the verdict.... There is no injustice in punishing one of two guilty principals when the jury has possibly miscarried justice by acquitting the other guilty principal on the basis of mistake, compromise, lenity or nullification.”).
We find that the evidence presented by the state was sufficient to convince a rational jury that all the elements of La. R.S. 14:202(A) were proven beyond a reasonable doubt.
DECREE
For the reasons stated herein, the judgment of the court of appeal is reversed and this case is remanded to the court of appeal for consideration of respondent’s remaining assignments of error pretermitted on original appeal.
REVERSED AND REMANDED.

 James C. Gulotta, Justice Pro Tempore, sitting for Associate Justice Hariy T. Lemmon.

. Cohn, Mula, and Trahan signed the contract as officers of TCM and in their individual capacities.

. Mula produced other checks written by him against his personal checking account from July, 1993, to September 1993, documenting expenses, some of which appeared related to the Broussard construction site. Mula also wrote five checks to Cohn in the total amount of $3,450 for unspecified work on the Brous-sard project. In repayment of these expenses, Mula immediately withdrew a total of $8,042.62 from the Hibernia account after the deposit of $44,000, on October 18, 1993, from Gulf Coast as the first draw on Broussard’s construction loan.

. Marx had also been arrested after TCM's failure and faced separate charges of his own at the time he testified at trial in the present case.

. On 11/05/93, a $950.00 payment is made to Mula and is listed as a "loan payment.” On 11/09/93, $35.64 is paid on account of Jami-son and Hubbert, but no work had been done, and a $30.00 late fee is paid to La. Home-builders Assoc. On 12/23/93, TCM is paid $500.00 on a loan payment for the Book Rack and on 12/31/93, a $500.00 payment is made to the Book Rack to "pay off loan.” On 1/6/94, Imperial Premium Finance Co. is paid $543.49 to pay off December-February interest. On 3/16/94, Mula is paid $1,000.00 for loans. On 3/24/94, Cohn is paid $500.00 for "Mise.” as well as other unaccounted for bills and expenses throughout the account.