I THIBODEAUX, Judge.
The defendant, Russell Ross Rubin, was convicted of second degree murder on April 24, 1994. He appealed, and this court granted a new trial because of erroneously-admitted hearsay evidence. State v. Rubin, 94-982 (La.App. 3 Cir. 2/8/95); 649 So.2d 1240, writ denied, 95-1135 (La.10/13/95); 661 So.2d 494. (“RubinI”).
Rubin’s second trial concluded on January 25, 1996; the jury found him guilty of second degree murder. The trial court denied his motion for post-verdict ^judgment of acquittal. The district court subsequently sentenced him to life imprisonment without benefit of parole, probation, or suspension of sentence, as required by statute.
The defendant now appeals his conviction and sentence on the basis of insufficiency of evidence. We affirm.

FACTS

The facts of this case are succinctly reported in Rubin I and need no further recitation or supplementation for purposes of this appeal.

ASSIGNMENT OF ERROR

In his sole assignment of error, the defendant alleges the trial court erred in denying his motion for a post-verdict judgment of acquittal. He argues the evidence was insufficient to support his conviction.
We evaluate the question of sufficiency of the evidence on appeal under the Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard review.
*5 The Jackson standard of review for acquittal motions is codified at La.Code Crim.P. art. 821:
A. The defendant may move for a post verdict judgment of acquittal following the verdict. A motion for a post verdict judgment of acquittal must be made and disposed of before sentence.
B. A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty.
C. If the court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense.
D. If a post verdict judgment of acquittal is granted or if a verdict is modified, the state may seek review by invoking the | .-¡supervisory jurisdiction of or by appealing to the appropriate appellate court.
E. If the appellate court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense.
Under the Jackson test, the State was required to prove the elements of second degree murder set forth, in pertinent part, in La.R.S. 14:30.1:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnaping, aggravated escape, armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.
* * * * * *
B. Whoever commits the Crime of second decree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
There was no question at trial that a murder had occurred within the meaning of the statute. The real issue at trial was whether the defendant was the person who hacked and shot Mrs. Lavergne to death. As Rubin’s brief points out, his conviction was based upon circumstantial evidence, which is governed by La.R.S. 15:438:
The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.
This standard is not separate from the Jackson test. It is part of a conventional sufficiency review. State v. Sutton, 436 So.2d 471 (La.1983). See also State v. Captville, 448 So.2d 676 (La.1984). The defense points out that where identification is a key issue, the State must negate any reasonable probability of misidentification. This standard is also part of an overall Jackson review. See, e.g., State v. Chavis, 542 So.2d 181 (La.App. 3 Cir.1989). As the defendant notes in his brief, the State adduced the following evidence against him:
1. Defendant’s fingerprints on a bag of potato chips found on the counter of the store;
2. Testimony by State witness, Adrian Charles, that Russell Rubin had stated prior to the murder that he was planning to rob a store close by his house in the neighborhood, but that Russell had told him that “he couldn’t get in” because “they had a lock on the back”;
3. That a .22 caliber casing, found at the crime scene the day after the murder, had been fired from a .22 caliber gun that had been found behind a nearby high school two months after the murder;
4. That a .22 caliber weapon was found in a school yard months after the killing and the school yard was in close prox *6 imity to the Lavergne store and Russell Rubin’s home;
5. Defendant’s statement wherein he denied being involved in the murder but did admit being in the store to purchase some items, and while there left a potato chip bag, which bag contained his left thumbprint, on the counter due to the fact that he did not have enough money to purchase that item.
6. Defendant’s statement wherein he admitted that a friend had showed him a gun in the Chatagnier High School yard next to his home, but it wasn’t established if this was before or after Bernice Lavergne’s murder in November of 1992. A state witness testified Rubin showed him the pistol about a month before the murder.
7. That the State enlisted the services of a blood hound the night of the murder; that the dog picked up a scent from an unidentified rag in a box with the murder weapon (machete); that the dog ran past the Rubin house and twice indicated a desire to run toward the Rubin home, but that police officers pulled the bloodhound away, thinking the bloodhound was interested in a gyp located in the Rubin yard.
IsActually, the defendant admitted to police he was in the store and touched the bag of potato chips sometime after 4:30 or 5:00 p.m. Also, the pistol he was seen with before the murder was found after the crime in the schoolyard next to his parents’ home. These facts, coupled with the evidence presented as to Mrs. Lavergne’s daily routine (i.e., her methods of closing the store at approximately 5:00 p.m. and carrying her cash to her car), present a strong circumstantial case. The defendant’s earlier statements to police denied that he was in the store near closing time; he changed his story when he learned the State had found his thumbprint on the potato chip bag. Rubin changed his story again when he was told his fingerprint was found on the pistol.[1]
The State proved that the defendant was planning to rob a store near his home, that he possessed the murder weapon before the murder and that weapon was found near his home after the murder; also, the defendant was in the store and at the counter within an hour of the killing.
These facts form a ease strong enough to exclude every reasonable hypothesis of innocence. It is possible the defendant stopped in the store shortly before the murder and touched the potato chip bag, and that someone else obtained the pistol he possessed before the incident, then murdered Mrs. Lav-ergne and dropped the pistol in the schoolyard beyond the defendant’s house. While these hypotheses are possible, they are not reasonable in light of the total evidence.
The defendant now disputes the State’s evidence on four specific points:
1. Rubin’s fingerprint on a potato chip bag in the victim’s store:
The defense argues that Rubin’s left thumbprint on a bag of potato chips at the crime scene is consistent with his left-handedness. Wounds on the victim’s left [ ^forearm were consistent with a right-handed attacker if the two were face-to-face. At trial, neither side pursued this point in detail, although the State’s redirect offered the possibility that the victim turned away during the attack. The prosecution also noted the defendant may have held the pistol in one hand while hacking with the other. Also, while the print is direct evidence Rubin was at the crime scene, it is merely circumstantial evidence that he was at the scene when the crime occurred. The jury was aware of the evidence mentioned. The weighing of such evidence was squarely within the jury’s province.
Rubin correctly notes the print itself was only circumstantial evidence regarding his identity as the killer; however, it was a component in a larger circumstantial case. As previously mentioned, the print apparently led the defendant to change his account of his movements the day of the murder. In *7 his first statement, he denied being in the store at all; when confronted about the print, Rubin admitted being in the store on the afternoon of the crime, at about 5:00 p.m.
2. A police bloodhound twice went directly to Rubin’s home the night of the murder:
The defense argues the State never identified the rag police used to give the hound a scent. At trial, police testified the rag was in a box with the machete used in the murder. There was no evidence linking the rag directly to the crime. Officers did not use the weapon itself, because they did not want to contaminate it. One officer, June Wilder, testified she put the machete in an empty box found at the store while securing evidence; apparently she did not recall seeing a rag in the box. In his closing, defense counsel emphasized this contradiction in the evidence. Again, this was a matter to be weighed by the jury.
3. The .22-caliber pistol found in the Cha-tagnier High schoolyard:
The single-shot pistol used against Mrs. Lavergne was found in January 1993 by a student in the schoolyard near Rubin’s home. The defense attacks the 17witnesses the State used to connect the defendant to the pistol. Delton Serie testified Rubin had shown him the weapon about a month before the crime. Serie also said police showed him a photograph of the pistol in late 1992; this represents an obvious temporal problem, since authorities had not discovered the pistol at that point. However, police testimony showed Serie made a positive identification of the weapon itself in April 1993. Thus, the time-related contradiction becomes a weight or credibility determination.
Another witness, Napoleon Freeman, stated the defendant had shown him a pistol “just like” the one used during the murder “sometime” before it happened. As the defense points out, Freeman’s testimony was equivocal. Again, weight and credibility were matters for the jury to assess.
In his brief, the defense counsel speculates the “dark brown” .22 pistol mentioned by Freeman may have been the weapon eonfis-cated from Rubin’s stepfather. Testing did not link the stepfather’s weapon to the crime.

4.Rubin was planning a robbery:

One of the witnesses, Adrian Charles, stated that before the murder, the defendant told him he was planning to rob a store near his (Rubin’s) home. Rubin told Charles he had made a prior attempt to break into the back door, but had been stymied by the padlock. Other evidence showed the Lav-ergnes had placed a particularly theft-resistant padlock on the store’s back door before the offense. The defendant told Charles he had been watching the store and planned to rob it at about 5:00 p.m., when the victim would be putting away her money. Rubin apparently believed there was a safe in the rear of the store. Other testimony showed Mrs. Lavergne kept money in the store’s rear area, but at the end of the workday she put it all in her car. It appears Rubin had formed a- general idea of how money was handled at the Lavergne store. Charles’ testimony presented strong circumstantial evidence for the jury to consider.
| gOther evidence:
Defense counsel also attacks the State’s case based upon evidence it did not adduce. His brief states:
Russell Rubin’s fingerprints were not found on the 2”x4” board used by the murderer to lock the store from the inside, nor were his fingerprints found on the murder weapon (machete), nor were his fingerprints found on the pistol used to shoot Bernice Lavergne, nor were his fingerprints found on the cash register which was covered in blood after the murder, nor were his fingerprints found on the plastic Winn Dixie grocery bag which had contained monies taken from the store by the perpetrator, nor were his footprints found on the bloody carpet area behind the counter where Bernice Lavergne’s body lay, nor were his hair, blood, skin or saliva found at the grisly murder scene, nor did a police search of Rubin’s parent’s home uncover any evidence connected to the Lav-ergne murder or the robbery at the store.
Much of the evidence mentioned above was not found because police chose not to *8 seek it. As part of their investigation, police elected not to dust for fingerprints in various areas because they did not present good surfaces for such testing. Some areas of the crime scene simply did not reveal any usable fingerprints. Also, many people apparently entered the crime scene during the investigation, leaving footprints in the store. Forensic experts were unable to match any of the prints found to shoes submitted by the defendant. There was a large amount of blood at the scene, but it was the victim’s. The jury was aware of the points the defense now raises. It was up to the jurors to weigh and consider such arguments. State v. Glenn, 493 So.2d 806 (La.App. 2 Cir.1986), sentence vacated, 513 So.2d 445 (La.App. 2 Cir. 1987).

Summary:

A reasonable view of the entirety of the State’s case reveals its strength. Each witness or piece of evidence, viewed in isolation, might seem subject to attack or attributable to coincidence. However, viewing the totality of the evidence in the light most favorable to the prosecution, while the state may not have excluded every possible hypothesis of innocence, it did exclude every reasonable hypothesis, as ^required by law. See, e.g., State v. Etienne, 94-910 (La.App. 3 Cir. 2/1/95); 649 So.2d 1230, writ denied, 95-544 (La.6/23/95); 656 So.2d 1012; also State v. James, 499 So.2d 721 (La.App. 3 Cir.1986).
Recently, in State v. Gallow, 95-1555, pp. 3-4 (La.App. 3 Cir. 9/18/96); 680 So.2d 729, 732 this court upheld the defendant’s conviction for second-degree murder:
As the defendant correctly notes, the prosecution’s case was based upon circumstantial evidence. Direct evidence clearly showed Gallow was in the victim’s house at or after the murder; i.e. bloody palm-prints, fingerprints, and footprints. Also, in an oral statement to a police officer, Gallow said he had found Tremie’s bloody corpse. The murder weapon was never found, and there were no eyewitnesses. The prosecution presented testimony indicating the apparently unemployed defendant had several $100.00 bills in his possession late Saturday night (October 8), its case theory being that Gallow slew Tremie, a small-businessman, for the cash.
* * * * * *
The prosecution also emphasized the defendant’s inconsistent accounts of his whereabouts the weekend of the murder. On October 9, he told the police that he had not seen Tremie at all during the weekend; on October 10, he told them that he had last seen Tremie on October 6, the Thursday before the murder. Finally, on October 27, he stated that he had walked into Tremie’s house and found the corpse lying on the floor in “lots of blood.” The defense argued that the variations stemmed from simple fear of being linked to a heinous crime.
Ultimately, the state’s case rested upon two main points: the evidence that the defendant was in Tremie’s house (and contacted Tremie’s blood) during or after the murder, and his possession of an unusual amount of cash within a short time period after the murder.
The court concluded the State’s case excluded every reasonable hypothesis of the evidence. Similar reasoning excludes any reasonable hypothesis in the present case. The evidence was sufficient to support a conviction for second degree murder.

\ ^CONCLUSION

For the foregoing reasons, the defendant’s conviction and sentence are affirmed.
AFFIRMED.

. This was not true; police told defendant this as an interrogation technique. Police did not publicize the pistol's use in the crime.