TERRI F. LOVE, Judge.
| ,This appeal arises from the defendant’s conviction of attempted second degree murder. Defendant contends that there was insufficient evidence to support a conviction, that the identifications were suggestive and unreliable, and that the trial court abused its discretion in denying the defendant’s Motion to Continue Trial. Defendant also asserts that the State made inappropriate remarks during closing statements, which warranted a mistrial and that his sentence to serve thirty years imprisonment at hard labor without probation, parole, or suspension, to run concurrently with any other sentence he may be serving, and with credit for time served was excessive.
For the above-mentioned reasons, we find that sufficient evidence was presented at trial to convince a rational trier of fact of Mr. Caliste’s guilt. We further find that the identifications of Mr. Caliste as the shooter were reliable. Also, the trial court did not abuse its discretion in denying Mr. Caliste’s Motion to Continue Trial. The trial court afforded Mr. Caliste the proper remedy after the State’s remarks regarding the “Bloods” during closing argument and Mr. Caliste did not preserve his right to appellate review of an allegedly excessive sentence. Accordingly, we affirm.
| ¿FACTUAL BACKGROUND AND PROCEDURAL HISTORY
An altercation occurred in the Viola Nightclub (“Viola”) at the corner of Decatur and Bienville Streets during a party given by Shive Magazine, which is owned by Gerelle Caliste’s sister. Dejuan Crawford, his brother, and friends attended the party to promote Mr. Crawford’s music. Mr. Crawford witnessed an altercation between his brother and another man. A person in the crowd allegedly tossed a red bandana onto the floor of the Viola in the area of the altercation. Mr. Crawford, his brother, and friends were escorted out of the Viola. While walking towards his car located in the Sugar Lot parking area (“Sugar Lot”) at the corner of Bienville and North Peters Street and talking to his brother on the cell phone, Mr. Crawford was shot multiple times.
Mr. Caliste was charged with the attempted second degree murder of Mr. Crawford. Mr. Caliste entered a not guilty plea. The trial court found probable cause and denied Mr. Caliste’s Motions to Suppress the Evidence and Identification. On the first day of trial, Mr. Caliste’s counsel filed a Motion to Continue, which the trial court denied. Counsel for Mr. Caliste also requested a mistrial during the trial, which was denied. The jury found Mr. Caliste guilty as charged. The trial court denied a Motion for Post-Verdict Judgment of Acquittal and a Motion for a New Trial. Mr. Caliste was sentenced to serve thirty years imprisonment at hard labor without probation, parole, or *11 suspension, to run concurrently with any other sentence he may be serving, and with credit for time served. Mr. Caliste’s counsel filed a Motion for Appeal and a Motion to Reconsider Sentence. Mr. Cal-iste’s motion for appeal was granted. However, the trial court did not rule on the Motion to Reconsider Sentence.
| ^Testimony of Dejuan Crawford
Mr. Crawford testified that he, his brother, and some friends were inside the Viola at the corner of Decatur and Bien-ville Streets, during a party given by Shive Magazine to promote Mr. Crawford’s music. Mr. Crawford witnessed an altercation between his brother and another man. The men exchanged words and someone in the Viola tossed a red bandana in the area of the altercation. Mr. Dejuan testified that the “Bloods” toss a red bandana signify murder. Mr. Crawford, his brother, and friends were subsequently asked to leave the Viola. Mr. Crawford escorted his brother to his car, which was parked near Cafe du Monde. Mr. Crawford then walked to his car, parked in the Sugar Lot at the corner of Bienville and North Peters Street, while talking to his brother on the phone.
When Mr. Crawford reached the Sugar Lot, he was approached by Mr. Caliste holding a pistol. Mr. Caliste asked Mr. Crawford if he “sweated that.” Mr. Crawford told Mr. Caliste that he did not understand the meaning of “sweated that.” Mr. Caliste then shot Mr. Crawford, causing him to fall to the ground. Mr. Crawford was unconscious and did not remember being shot twice more.[1] However, before being shot, Mr. Crawford viewed Mr. Caliste’s face and was able to identify Mr. Caliste in a six-person photographic lineup. Mr. Crawford also identified Mr. Caliste in court.

Testimony of Detective Tindell Murdock, Jr.

Several New Orleans Police Department (“NOPD”) police officers were in the area of the shooting because of an earlier fight that occurred alongside the Viola. Detective Tindell Murdock, Jr., who was working a paid detail at the Viola, 14was alerted to the altercation by a concerned citizen at approximately 3:00 a.m.[2] Detective Mur-dock radioed for additional NOPD units. Most of the crowd dispersed prior to the arrival of the additional NOPD units. However, some of the subjects were still arguing. Detective Murdock followed one of the subjects to the corner of Bienville and North Peters Streets because the subject was making threats. Detective Mur-dock then heard a single gunshot. Detective Murdock located where the gunshot came from and observed Mr. Caliste[3] stand over Mr. Crawford and fire two more shots while in the well-lit Sugar Lot.
Detective Murdock and several NOPD officers chased Mr. Caliste. Mr. Caliste looked in the direction of Detective Mur-dock before running; therefore, Detective *12 Murdock was able to ascertain Mr. Cal-isteis facial features. Because a number of other NOPD officers were pursuing Mr. Caliste, Detective Murdock ended his pursuit to tend to Mr. Crawford. Detective Murdock called EMS, secured the scene, and located two spent bullet casings. A third bullet casing was never located.
After Mr. Caliste was apprehended, he was taken to the scene where Detective Murdock positively identified Mr. Caliste as the person who shot Mr. Crawford two times while Mr. Crawford was on the ground. Detective Murdock noted that Mr. Caliste had removed his white t-shirt. Detective Murdock identified Mr. Caliste in court.

Testimony of Sergeant Keith Joseph

Sergeant Keith Joseph, one of the NOPD officers who responded to | ¿Detective Murdock’s call for extra NOPD units, was facing in the direction of the Sugar Lot when the first gunshot rang out. Sergeant Joseph clearly saw Mr. Caliste, observed Mr. Caliste standing over Mr. Crawford, and witnessed Mr. Caliste shoot Mr. Crawford twice. Sergeant Joseph pursued Mr. Caliste in his NOPD vehicle. While in pursuit, Sergeant Joseph broadcast a description of Mr. Caliste over his radio and informed other NOPD officers that Mr. Caliste still had a gun in his hand. Sergeant Joseph exited his vehicle and ordered Mr. Caliste to stop. Mr. Caliste faced him, allowing Sergeant Joseph to view Mr. Caliste’s face. Sergeant Joseph lost sight of Mr. Caliste when he ran behind the floodwall at St. Louis Street.[4] Once Mr. Caliste was arrested and taken back to the scene, Sergeant Joseph positively identified Mr. Caliste. Sergeant Joseph also identified Mr. Caliste in court.

Testimony of Leonard Acklin

The night supervisor for Central Parking, Leonard Acklin, was alerted that a gunman was on the premises and was told to turn the surveillance cameras in the Sugar Lot towards the direction of the NOPD officers. Mr. Acklin entered his office and directed a camera towards the back of the Sugar Lot where vehicles enter. The shooting was captured on video. Mr. Acklin also dispatched Deputy Anthony Carey, who was employed by the Orleans Parish Sheriffs Department and working a paid detail for Central Parking, to the Sugar Lot.

Testimony of Deputy Anthony Carey

When Deputy Carey received the call from Mr. Acklin, he was located in his vehicle in the drive of the Sugar Lot facing Bienville Street and parallel to North |fiPeters Street. Mr. Acklin provided a description of Mr. Caliste, and while he was on the phone with Mr. Acklin, Deputy Carey saw Mr. Caliste in his rearview mirror. A shot was fired, and Deputy Carey saw a man drop to the ground. As Deputy Carey was exiting his vehicle, he saw Mr. Caliste fire two more shots at Mr. Crawford as he was standing over him. Deputy Carey ordered Mr. Caliste to stop; Mr. Caliste fled, and Deputy Carey pursued Mr. Caliste on foot. Deputy Carey lost sight of Mr. Caliste in the area of the floodwall, but he observed other NOPD officers in pursuit. Deputy Carey stated that Mr. Caliste still had the gun in his hand when he went behind the floodwall. After Mr. Caliste was apprehended, Depu *13 ty Carey identified Mr. Caliste as the person he witnessed shoot Mr. Crawford and whom he chased. Deputy Carey was able to identify Mr. Crawford by his physical and clothing description, noting that he had since lost his white t-shirt. Deputy Carey also identified Mr. Caliste in court.

Testimony of Detective Willie Jenkins

Detective Willie Jenkins, the lead detective, also responded to Detective Mur-dock’s call for extra NOPD units. Detective Jenkins did not witness the shooting, but he heard the gunshots and observed NOPD officers running towards the Sugar Lot. Utilizing his vehicle, Detective Jenkins proceeded up Conti Street to attempt to stop Mr. Caliste. Detective Jenkins continued to give chase; however, when he caught up with Mr. Caliste, Mr. Caliste was already apprehended by Lieutenant Frick and two mounted NOPD police units. Mr. Caliste’s white t-shirt was lying next to him.
Detective Jenkins obtained the videotape that captured the shooting from the manager of Central Parking and identified the tape in court. He also obtained the videotape from the surveillance camera at the Aquarium of the Americas and 17identified it in court.[5] The videotapes were shown to the jury.
Detective Jenkins first visited Mr. Crawford at his house and asked Mr. Crawford whether he would be able to identify the shooter from a photograph. Mr. Crawford answered affirmatively. During a later visit with Mr. Crawford, Detective Jenkins showed a photographic lineup to Mr. Crawford, who identified Mr. Caliste as the person who shot him. Although Mr. Crawford attended St. Mi-chaels Special Needs School, Detective Jenkins testified that Mr. Crawford did not need any assistance in answering questions.

Testimony of Lieutenant Derek Frick

Lieutenant Derek Frick also responded to Detective Murdock’s call for backup concerning the large fight. Lieutenant Frick heard a single gunshot, located Mr. Caliste, and observed Mr. Caliste shoot Mr. Crawford two more times. Lieutenant Frick gave chase in his NOPD vehicle; he drove behind the floodwall and saw Mr. Caliste running parallel to the river towards Canal Street with a white t-shirt and a gun in his hands. Lieutenant Frick eventually exited his vehicle and apprehended Mr. Caliste on foot; two mounted NOPD units were also there. No one else was along the Mississippi River except for NOPD officers and Mr. Caliste. Lieutenant Frick identified Mr. Caliste as the shooter, upon Mr. Caliste’s apprehension, and in court.

Testimony of Robert Body

One civilian witness, Robert Body, testified that he joined in the chase with NOPD officers, but stopped his pursuit of Mr. Caliste at the floodwall. Mr. Body gave the same description of Mr. Caliste as the NOPD officers. Mr. Body identified Mr. Caliste at the scene and in court.
| ¿Testimony of Joel Maier
The parties stipulated that Joel Maier, who works for the St. Tammany Parish Crime Lab, was a gunshot residue (“GSR”) specialist. He tested four stubs, which are metal pieces containing a sticky carbon paper, that were used to blot Mr. Caliste’s hands. No GSR was found on any of the stubs. However, Mr. Maier opined that the absence of GSR is indeterminate as to whether a person fired a gun because GSR *14 is short-lived and can fall off of a person’s hands with movement or wiping.

ERRORS PATENT

The record reveals that the trial court did not rule on Mr. Caliste’s Motion for Reconsideration of Sentence.
At sentencing on September 23, 2011, no objection was lodged to the sentence imposed. Mr. Caliste’s Motion to Reconsider Sentence was not filed until November 16, 2011. La.C.Cr.P. art. 881.1(A)(1) provides:
A. (1) In felony cases, within thirty days following the imposition of sentence or within a longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence. (Emphasis added).
Mr. Caliste’s Motion to Reconsider Sentence was filed more than thirty days after sentencing, and the trial court did not set a longer period for the filing of the written motion.
The failure to file a motion to reconsider within the time delays required prevents the trial court from considering the motion. State v. Williams, 96-1587, p. 11 (La.App. 4 Cir. 4/16/97), 693 So.2d 249, 255. Thus, this Court denied Mr. Caliste’s counsel’s Motion to Remand for a ruling on the motion to reconsider | sentence. Accordingly, the trial court decision not to rule on Mr. Caliste’s Motion to Reconsider Sentence does not constitute an error, as it was not timely filed.

INSUFFICIENT EVIDENCE

Mr. Caliste asserts that the evidence against him was insufficient due to a lack of motive and because the physical evidence was allegedly exculpatory.
In reviewing a claim of insufficiency of evidence, courts must apply the standard set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). State v. Captville, 448 So.2d 676, 678 (La.1984). “[T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” Id. “When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that ‘assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.’ ” State v. Neal, 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657, quoting La. R.S. 15:438.
A conviction for attempted second degree murder requires proof that the offender “had the specific intent to kill and committed an act tending toward the accomplishment of that goal.” State v. Sullivan, 97-1037, p. 20 (La.App. 4 Cir. 2/24/99), 729 So.2d 1101, 1111. “Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). “Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant.” State v. Bishop, 01-2548, p. 4 (La.1/14/03), 835 So.2d 434, 437.
Mr. Caliste avers that the State failed to prove a motive for the shooting. | in“Motive is not an essential element of murder, but ‘a lack of motive may properly be considered as a circumstance mitigating against specific intent.’ ” State v. Williams, 633 So.2d 147, 149 (La.1994), quoting State v. Mart, 352 So.2d 678, 681 (La.1977).
In the case sub judice, the jury reasonably inferred that Mr. Caliste had the specific intent to kill Mr. Crawford *15 when he stood over Mr. Crawford and fired two more shots after Mr. Crawford fell to the ground from the first shot. The shooting was witnessed by various law officers, and even though the law officers lost sight of Mr. Caliste for a couple of seconds when he ran behind the floodwall, Mr. Caliste was positively identified by those law officers as the person who shot Mr. Crawford. Moreover, Mr. Crawford positively identified Mr. Caliste from a six-person photographic lineup, as the person who shot him.
Mr. Caliste’s assertion that the physical evidence exonerates him because no weapon was found and no GSR was found on his hands is without merit. The jury could reasonably infer that Mr. Cal-iste disposed of the weapon once he ran behind the floodwall, as he was observed by law officers going behind the floodwall with the weapon in his hands. Also, Mr. Maier testified that the lack of GSR on Mr. Caliste’s hands was indeterminate as to whether he fired a gun.
Accordingly, we find that, when, viewed in the light most favorable to the prosecution, the evidence presented at trial was sufficient to convince a rational trier of fact that Mr. Caliste attempted to kill Mr. Crawford beyond a reasonable doubt.

SUGGESTIVE IDENTIFICATION

Mr. Caliste contends that the show-up identifications made by the witnesses together were unduly suggestive. He also asserts that the photographic line-up Inwith Mr. Crawford was unreliable because Detective Jenkins had to refresh Mr. Crawford’s memory.
In State v. Green, 10-0791, pp. 8-9 (La.App. 4 Cir. 9/28/11), 84 So.3d 573, 580, this Court set out the pertinent law regarding suggestive out-of-court identifications as follows:
The defendant bears the burden of proving that an out-of-court identification was suggestive and that there was a substantial likelihood of misidentification as a result of the identification procedure. State v. Ballett, 98-2568, p. 17 (La.App. 4 Cir. 3/15/00), 756 So.2d 587, 597; State v. Martello, 98-2066, p. 8 (La.App. 4 Cir. 11/17/99), 748 So.2d 1192, 1198. A defendant must first prove that the identification was suggestive. State v. Thibodeaux, 98-1673, pp. 20-21 (La.9/8/99), 750 So.2d 916, 932. An identification procedure is suggestive if, during the procedure, the witness’s attention is unduly focused on the accused. State v. Campbell, 2006-0286, pp. 87-88 (La.5/21/08), 983 So.2d 810, 866.
, Thus, one-on-one identifications, like the one utilized by police in the instant case, are generally not favored, although such identification procedures are permissible under certain circumstances. State v. Nelson, 2008-0584, p. 5 (La.App. 4 Cir. 12/17/08), 3 So.3d 57, 60. One-on-one identifications are permissible, for example, when the accused is. apprehended within a relatively short period of time after the occurrence of the crime and is returned to the scene for immediate identification. State v. Robinson, 2009-0922, p. 2 (La.App. 4 Cir. 3/10/10), 50 So.3d 158, 160, writ denied, 2010-0824 (La.11/5/10), 50 So.3d 813. Immediate confrontation assures the reliability of the identification — given that the perpetrator’s appearance is fresh in the witness’s mind — lessens the possibility that the perpetrator’s clothes or appearance will be changed, and insures early release of innocent subjects. Nelson, 2008-0584, pp. 5-6, 3 So.3d at 61. However, a one-on-one identification procedure is not suggestive per se. State v. Tapp, 99-2279, p. 14 (La.App. 4 Cir. 5/30/01), 788 So.2d 1215, 1225, citing State v. Martello, 98-2066, p. 8 (La.App. *16 4 Cir. 11/17/99), 748 So.2d 1192, 1199. Thus, it necessarily follows that a one-on-one identification does not unduly focus the witness’s attention on the accused, per se.
In addition to suggestiveness, a defendant must prove that there was a substantial likelihood of 112misidentification as a result of the identification procedure. Robinson, 2009-0922, p. 3, 50 So.3d at 161. Despite the existence of a suggestive pretrial identification, an identification may be permissible if there does not exist a “very substantial likelihood of irreparable misidentification.” Manson v. Brathwaite, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977); State v. Leger, 2005-0011, p. 59 (La.7/10/06), 936 So.2d 108, 151, quoting Manson. Under Manson, the factors which courts must examine to determine, from the totality of the circumstances, whether the suggestive identification presents a substantial likelihood of misidentification include: 1) the witness’s opportunity to view the criminal at the time of the crime; 2) the witness’s degree of attention; 3) the accuracy of his prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation. Manson, 432 U.S. at 114-115, 97 S.Ct. at 2254.
Mr. Caliste contends that because Detective Murdock, Sergeant Joseph, Deputy Carey, and Mr. Body were all allegedly together when they identified him as the shooter, they improperly influenced each other in making their identifications.
In State v. Galle, 04-1844, p. 2 (La.App. 4 Cir. 5/18/05), 904 So.2d 773, 774, a man robbed three victims after speaking with them as they stood on the sidewalk. The victims then viewed the alleged perpetrator together from the back of a police car. Id., 04-1844, p. 3, 904 So.2d at 775. All three women identified the defendant as the robber. Id. The trial court held that the identifications were suggestive. Id., 04-1844, p. 6, 904 So.2d at 777. However, “even a suggestive out-of-court identification will be admissible if it is found reliable under the totality of circumstances.” Id., 04-1844, p. 5, 904 So.2d at 776. This Court found that the identification procedure was reliable based on a review of the Manson factors. Id., 04-1844, p. 3, 904 So.2d at 775.
The identifications in the case sub judi-ce were made within a few minutes of | )3the shooting. All of the law officers observed Mr. Caliste shoot Mr. Crawford. Deputy Carey witnessed Mr. Caliste shoot Mr. Crawford three times in the Sugar Lot, which was well-lit. Detective Mur-dock and Sergeant Joseph observed Mr. Caliste in the Sugar Lot standing over Mr. Crawford while he fired two shots. Detective Murdock testified that he was able to ascertain Mr. Caliste’s facial features. Sergeant Joseph also viewed Mr. Caliste’s face. All of the witnesses gave the same physical description of Mr. Cal-iste as thin built with dreadlocks, wearing a white t-shirt, dark jeans, and white tennis shoes. Additionally, all of the witnesses who identified Mr. Caliste on the scene were certain of their identification. Thus, Mr. Caliste has not shown that there was a substantial likelihood of mis-identification.
Likewise, Mr. Crawford’s identification of Mr. Caliste was reliable. Although Mr. Caliste asserts that Mr. Crawford’s identification was unreliable because Detective Jenkins had to refresh Mr. Crawford’s memory, nothing in the record indicates that Detective Jenkins overtly influenced Mr. Crawford to select Mr. Cal-iste’s picture from the six-person photographic lineup. Detective Jenkins’ testi *17 mony reflects that he first visited Mr. Crawford at his house to ask whether he could identify the shooter from a photograph. After receiving an affirmative response, Detective Jenkins returned to Mr. Crawford’s house to show him the lineup. Mr. Crawford identified Mr. Caliste as the shooter. Thus, as in Galle, the identifications were reliable based upon a review of the Manson factors. Therefore, the trial court did not err by denying Mr. Caliste’s Motion to Suppress the Identifications.

MOTION TO CONTINUE

Mr. Caliste asserts that the trial court abused its discretion by denying his 114Motion to Continue Trial based on the late disclosure of the 911 recording and the results of the GSR tests.
In State v. Manning, 03-1982, p. 80 (La.10/19/04), 885 So.2d 1044, 1077, the Supreme Court stated:
We have consistently held that the decision whether to grant or refuse a motion for a continuance rests within the sound discretion of the trial judge, and a reviewing court will not disturb such a determination absent a clear abuse of discretion. Bourque, 622 So.2d at 225; see La. Code Crim. Proc. Ann. art. 712. In addition, this Court generally declines to reverse convictions even on a showing of an improper denial of a motion for a continuance absent a showing of specific prejudice. Bourque, 622 So.2d at 225; State v. Champion, 412 So.2d 1048, 1051 (La.1982).
Counsel for Mr. Caliste orally moved for a continuance on the first day of trial because she allegedly received the 911 recording and the results of the GSR report the day before the trial began.[6] Mr. Cal-iste’s counsel avered that she did not have time to read and understand the GSR report and that she did not have time to fully listen to the 911 recording. Counsel for Mr. Caliste suggested that she might have subpoenaed the 911 caller as a witness. Mr. Caliste asserts that he was prejudiced by the denial of his Motion for Continuance based on the late disclosure of the 911 recording and GSR report because both contain exculpatory material.
“[L]ate disclosure as well as nondisclosure of exculpatory evidence may deprive the defendant of a fair trial.” State v. Kemp, 00-2228, p. 7 (La.10/15/02), 828 So.2d 540, 545. “[T]he prosecution must make timely disclosure of the favorable evidence to provide the defense with adequate opportunity to present the material effectively in its case.” Id. Moreover, “even though the prosecution does not possess or have knowledge of evidence, this does not necessarily absolve the 11sstate of its responsibilities under Brady because ‘the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government’s behalf in the case, including the police.’ ” State v. Louviere, 00-2085, p. 13 (La.9/4/02), 833 So.2d 885, 896, quoting Kyles v. Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).
Mr. Caliste cannot show prejudice by the late disclosure of the 911 recording and the GSR report. There is no evidence that Mr. Caliste’s defense of misidentification was jeopardized by the 911 recording or the GSR report. The 911 caller, who wished to remain anonymous, gave a similar description of the shooter as that given by the witnesses at trial. Also, counsel for Mr. Caliste had the opportunity to cross-examine the analyst who performed the GSR tests. Although Mr. Caliste’s counsel was not privy to the 911 recording or the GSR report until the day before trial, the *18 essential facts of the case did not change. Mr. Caliste was observed shooting Mr. Crawford by numerous law officers and one lay witness. Mr. Crawford also identified Mr. Caliste as the shooter. Thus, the trial court did not abuse its vast discretion in denying Mr. Caliste’s Motion to Continue Trial.

IMPROPER CLOSING ARGUMENT

Mr. Caliste contends that the State’s rebuttal closing argument was improper because it characterized him as a dangerous gang member seeking retaliation against Mr. Crawford.
On rebuttal, the State opined that:
Dejuan Crawford lives in the City of New Orleans, testifying against members of a gang, against Bloods. And he has to live knowing ...
Counsel for Mr. Caliste objected on the basis that it assumed facts that were not in evidence. The trial court agreed, noting that the argument was improper; however, 1 mMr. Caliste’s counsel did not move for a mistrial or request an admonition from the trial court.
In State v. Woodfork, 07-1396, p. 4 (La.App. 4 Cir. 3/19/08), 981 So.2d 717, 720, the defendant argued on appeal that the prosecutor made a comment regarding his failure to testify, and that the trial court had erred by failing to grant a mistrial based on that comment. This Court noted that although the defendant’s counsel objected to the remark he did not move for a mistrial, and thus that the trial court’s sustaining of his objection granted the only relief requested. Id., 07-1396, p. 5, 981 So.2d at 720. This Court further found that if the defendant’s counsel requested a mistrial, the trial court would not have abused its discretion by failing to grant one. Id.
The general rules on closing/rebuttal argument are that the scope of closing “argument shall be confined to the evidence admitted,” “the lack of evidence,” “conclusions of fact that the state or defendant may draw therefrom, and the law applicable to the case;” “the argument shall not appeal to prejudice.” State v. Marlowe, 10-1116, p. 65 (La.App. 4 Cir. 12/22/11), 81 So.3d 944, 982, quoting La. C.Cr.P. art. 774. Additionally, “[t]he state’s rebuttal shall be confined to answering the argument of the defendant.” La.C.Cr.P. art. 774. “Although prosecutors have wide latitude in framing the closing argument, they ‘may not resort to personal experience or turn argument into a plebiscite on crime.’ ” State v. Fortune, 10-0599, p. 8 (La.App. 4 Cir. 12/22/10), 54 So.3d 761, 766, quoting State v. Clark, 01-2087, p. 15 (La.App. 4 Cir. 9/25/02), 828 So.2d 1173, 1183.
However, prosecutors have “wide latitude in choosing closing argument tactics.” State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036. “Further, the trial judge has broad discretion in controlling the scope of closing 117arguments.” Id. “[E]ven if the prosecutor exceeds these bounds, the court will not reverse a conviction unless ‘thoroughly convinced’ that the argument influenced the jury and contributed to the verdict.” Id. Even where the prosecutor’s statements are improper, “[c]redit should be accorded to the good sense and fairmindedness of jurors who have heard the evidence.” State v. Jarman, 445 So.2d 1184, 1188 (La.1984).
The State contends that the remark regarding “Bloods” was in response to Mr. Caliste’s counsel’s attempt during closing arguments to characterize Mr. Crawford as someone who would lie to appease the police and the State. However, trial testimony presents Mr. Caliste’s alleged affiliation with a gang because an alleged friend of Mr. Caliste threw a red bandana on the *19 floor during the initial altercation that occurred in the Viola.
In light of the evidence adduced at trial, the State’s comment referring to Mr. Caliste’s alleged gang affiliation did not influence the jury or contribute to the verdict. As the State notes, the shooting of Mr. Crawford and apprehension of Mr. Caliste were videotaped. Also, numerous witnesses observed Mr. Caliste shoot Mr. Crawford. Those same witnesses and Mr. Crawford positively identified Mr. Caliste as the shooter. Thus, the trial court afforded Mr. Caliste the only remedy his counsel requested, which was to sustain her objection. Accordingly, this assertion lacks merit.

EXCESSIVE SENTENCE

Mr. Caliste asserts that his thirty-year sentence as a first felony offender is excessive.
“This court has held that the failure to file a motion to reconsider sentence or to object to the sentence at the time it is imposed precludes a defendant from raising a | isclaim about his sentence on appeal.” State v. Wilson, 06-1421, p. 19 (La.App. 4 Cir. 3/28/07), 956 So.2d 41, 53.
As previously noted, counsel for Mr. Caliste did not object to the sentence imposed on September 23, 2011. In our discussion of patent errors, we found that Mr. Caliste’s Motion to Reconsider Sentence was not timely filed. See Williams, 96-1587, p. 11, 693 So.2d at 255. Thus, appellate review of Mr. Caliste’s sentence for excessiveness was not properly preserved.

DECREE

For the above-mentioned reasons, we find that sufficient evidence was presented at trial to convince a rational trier of fact of Mr. Caliste’s guilt. We further find that the identifications of Mr. Caliste as the shooter were reliable. Also, the trial court did not abuse its discretion in denying Mr. Caliste’s Motion to Continue Trial. The trial court afforded Mr. Caliste the proper remedy after the State’s remarks regarding the “Bloods” during closing argument and Mr. Caliste did not preserve his right to appellate review of an allegedly excessive sentence. Accordingly, we affirm.
AFFIRMED.

. Mr. Crawford was shot in the neck and arm, and he remained in the hospital for seven days. One of the bullets remains lodged in his neck.

. Giselle Bertrand, a 911 operator, identified the 911 recording and incident recall sheets of the fight and shooting. The 911 call was played for the jury. The 911 caller reported the fight. While on the phone, the shooting occurred. The 911 caller identified the shooter as having dreadlocks, dark skin, and wearing a white t-shirt and blue jeans'. The same 911 caller called a second time after seeing a body on the ground. At some point in the conversation with the 911 operator, the 911 caller stated that she did not want to get involved.

.Detective Murdock described Mr. Caliste as being thin built with dreadlocks, wearing a white t-shirt, dark jeans, and white tennis shoes.

. After the shooting, Mr. Caliste ran through the parking lots towards Conti Street. He ran behind the building where Landry's Seafood Restaurant is located, which placed him in the Jax Brewery Lot. Mr. Caliste then ran behind the floodgates at St. Louis Street running alongside the Mississippi River towards Canal Street. Mr. Caliste was apprehended in the Woldenberg Park area close to the Mississippi River near the Aquarium of the Americas.

. The Aquarium of the Americas tape allegedly shows Mr. Caliste removing his t-shirt as he was running. None of the exhibits are part of the record; the property room of the trial court never received any of the exhibits introduced at trial.

. No pretrial motions filed by Mr. Caliste’s counsel are part of the record.