| STATE OF LOUISIANA | * | NO. 2023-KA-0540 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| CHRISTOPHER M | * | |
| ALEXANDER | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 541-296, SECTION "F"
Honorable Robin D. Pittman, Judge
* * * * * *
**Judge Daniel L. Dysart**
* * * * * *

(Court composed of Judge Daniel L. Dysart, Judge Tiffany Gautier Chase, Judge Nakisha Ervin-Knott)

**ERVIN-KNOTT, J., CONCURS WITH REASONS**

Jason Rogers Williams
District Attorney
Brad Scott
Chief of Appeals
Zachary M. Phillips
Assistant District Attorney
ORLEANS PARISH DISTRICT ATTORNEY'S OFFICE
619 S. White Street
New Orleans, LA 70119

     COUNSEL FOR STATE OF LOUISIANA/APPELLEE

Holli Herrle-Castillo
LOUISIANA APPELLATE PROJECT
P. O. Box 2333
Marrero, LA 70073-2333

     COUNSEL FOR DEFENDANT/APPELLANT

     **CONVICTIONS AND SENTENCES AFFIRMED**

     **APRIL 23, 2024**

*DLD*
*TGC*
The defendant, Christopher M. Alexander, appeals his convictions and sentences for second degree murder pursuant to La. R.S. 14:30.1 and obstruction of justice pursuant to La. R.S. 14:130.1.  For the following reasons, we affirm the defendant's convictions and sentences.

**STATEMENT OF CASE**

On May 10, 2018, defendant, Christopher Alexander, was charged by bill of indictment with one count of second degree murder in violation of La. R.S. 14:30.1, and one count of obstruction of justice in violation of La. R.S. 14:130.1.  On May 15, 2018, defendant pled not guilty to the charges lodged against him.

Defendant proceeded to a jury trial on March 21, 2022, which concluded on March 24, 2022.  The jury unanimously found defendant guilty as to count one (second degree murder) and count two (obstruction of justice).

On November 4, 2022, the court sentenced defendant to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence for second degree murder and twenty-five years imprisonment at hard labor for obstruction of justice.  These sentences were to run concurrently and defendant

1

was given credit for time served. On that same date, the trial court granted defendant's motion for appeal.

**STATEMENT OF FACT**

At the defendant's trial, a number of witnesses were called to the stand and the following testimony was adduced.

Eddie Williams testified that he was employed by the New Orleans Police Department in the Digital Forensics Unit. After a recitation of Mr. Williams's credentials, he was qualified, without objection, as an expert in the area of mobile device forensic extraction. Mr. Williams stated that he performed a digital forensic extraction with regard to the investigation into the murder of the victim, Idrick Brister.

Mr. Williams was presented with state's exhibit 1-C which were defendant's cell phone call logs for January 8, 2018, the date of the murder. Also introduced into evidence was state's exhibit 2-A, which were the call detail records from T-Mobile, defendant's cell phone service provider, for January 8, 2018. Mr. Williams testified that based on defendant's call logs, the first call made on January 8, 2018 was at 9:22 a.m. Thereafter, Mr. Williams reviewed subsequent calls made that day by defendant, all of which coincided with T-Mobile's call detail records (i.e. these calls reflected on defendant's cell phone logs were also reflected in T-Mobile's call detail records).

There was, however, an earlier call made from defendant's cell phone that was <u>not</u> preserved on his call log, but was preserved in T-Mobile's call detail records. It was the very first entry on the T-Mobile call detail records evidencing a thirty-seven second call on January 8, 2018 at 4:09 a.m. Mr. Williams explained

2

that if someone deleted a call, it would not show up on his or her call logs, but would still be reflected in T-Mobile's call detail records.

Jafhawn Sanders testified that she knew the defendant in 2018; they were co-workers at the "Bywater Post Office" and later became friends, often exchanging text messages. Ms. Sanders stated that on January 5, 2018, she and the defendant went to a gun shooting range. She explained that she brought her own gun to the range and defendant rented a firearm. The state published to the jury state's exhibit 4 which depicted Ms. Sanders and defendant at the St. Bernard Sheriff Shooting Center.

Ms. Sanders confirmed that during the period between January 3 and January 10, 2018, the defendant spoke with her about his relationship with a woman named Jontrice Mims. Defendant stated that he was in love with Ms. Mims, that they had separated for a short time, but later "got back together" and he proposed to her. On cross-examination, Ms. Sanders stated that she suggested that they go to the gun range. She had been to the range before, but it was defendant's first time. She explained that defendant seemed fairly inexperienced; he had trouble loading the nine-millimeter gun and was not "able to clear the jam."

Dr. Erin O'Sullivan testified that she was a forensic pathologist with the Orleans Parish Coroner's Office. Following a recitation of her credentials, Dr. O'Sullivan was accepted, without objection, as an expert in the field of forensic pathology. Dr. O'Sullivan performed an autopsy on the victim, Idrick Brister. She testified that the victim suffered two gunshot wounds to the head which killed him. Dr. O'Sullivan classified the victim's death as a homicide.

New Orleans Police Department Detective Rayell Johnson testified that he was the homicide detective assigned to investigate the murder of Idrick Brister. He

stated that the murder occurred outside at 8015 Trapier Street in New Orleans East in the early morning hours of January 8, 2018.

At the murder scene, three forty-five caliber shell casings were recovered. Because shell casings were present, Detective Johnson knew that the murder weapon was a semi-automatic gun rather than a revolver. He explained that the only difference between the semi-automatic gun used to commit the murder and the nine millimeter semi-automatic gun defendant used at the gun range a few days earlier was the size of the bullets. The gun used in the shooting was not recovered. He explained that not finding a weapon at the crime scene was not unusual because shooters tend to discard their weapons. Based on the investigation, Detective Johnson testified that it was determined the shooter traveled to the crime scene by walking down an alleyway on the side of the residence located at 8015 Trapier Street. Detective Johnson said that the alleyway "leads out to Shubrick which is the street directly behind it." It was raining on the date of the murder and there was a fresh muddy shoe print in the alleyway, evidence that the shooter approached the residence from the alleyway.

Detective Johnson stated that firearm experts examined the three shell casings recovered from the murder scene and determined they were all fired from the same gun. Based on this information, it was concluded that only one shooter fired three shots at the victim, two of which struck him in the head.

Police spoke with two persons at the scene, Jontrice Mims, who lived with the victim, along with Ms. Mims's brother. Mr. Mims was able to corroborate that three shots were fired.

Based on the witness interviews, Detective Johnson determined that the defendant was the prime suspect in this murder. Detective Johnson also learned

that Ms. Mims had a prior romantic relationship with the defendant and determined that jealously was the motive behind the murder. This was learned in part from the defendant's Facebook and Instagram records. In his Instagram record (state's exhibit 8-A), defendant wrote about how hurt he was that Ms. Mims just used him for sex; telling him that she loved him, then breaking up with him and leaving him heartbroken. He also wrote that she lied when she told him she was in love with him and not "dude" (i.e., the victim, Idrick Brister). Defendant also wrote: "But now since this new nigga came in your life he gets the you I been dying to have." Further, defendant believed that Ms. Mims was pregnant with his child and he wanted to know "are you going to have it or kill it. I need to know." These messages were sent by defendant to Ms. Mims between January 4 and January 5, 2018, shortly before the murder.

There was surveillance video which showed the front of 8015 Trapier Street which was helpful in what it did not reflect. Specifically, it did not depict any vehicles pulling up in front of the residence. This, coupled with the shoe print found in the alleyway, led Detective Johnson to conclude that the perpetrator arrived at the residence by walking down the alleyway, thereby gaining access to the victim's driveway where the shooting occurred.

Detective Johnson testified that he interviewed defendant on January 10, 2018, two days following the murder. This interview (state's exhibit 37) was audio and video recorded and played for the jury. A review reflects that Detective Johnson read defendant his *Miranda* rights and defendant agreed to provide a statement. Defendant admitted that he had earlier had a relationship with Ms. Mims, stating that they had been together for six or seven years, but she had more recently been with the victim. He said that he and Ms. Mims had been "broken

5

up" for approximately seven months, but they remained friends. He estimated that he last spoke to Ms. Mims "two weeks ago." He stated that some people think he killed the victim because he was heartbroken over Ms. Mims leaving him and then proceeding to live with the victim, but, he maintained that "is not the situation."

Detective Johnson questioned defendant about where he was on the date of the murder. Defendant stated that he was at his aunt's house, 7726 Shubrick Avenue, which is located "right around the corner" from where the murder took place. He stated that he called United Cab to get there, explaining that a female, specifically, a stripper named "Cherry," gave him that address (7726 Shubrick Avenue) which just happened to be his aunt's house. He stated that he knocked on his aunt's house, but it was late and raining and his aunt did not answer the door. When she did not come to the door, defendant "just chilled in her carport." He estimated that this was at approximately 4:00 a.m. He left around 6:30 a.m. or 7:00 a.m. He stated that he "caught the bus back home."

Detective Johnson next asked defendant if he had ever been in trouble in the past. Defendant responded that his only prior offense was having a suspended driver's license. Detective Johnson testified that defendant was not telling the truth when he stated that other than having a suspended license, he had never been in trouble before. Further, defendant was not telling the truth with respect to his alleged acquaintance with a female named "Cherry." Detective Johnson explained that police attempted to locate this person and found "[n]othing." Additionally, police were not able to confirm that 7726 Shubrick Avenue was "a location of the defendant." However, 7726 Shubrick Avenue was "right around the corner" from the murder scene.

Detective Johnson testified that when the victim was killed, he had in his possession a cell phone, car keys and a wallet containing a "whole bunch of money…." None of these items were taken, leading to the conclusion that the motive for the murder was not robbery.

Following his interview with defendant, Detective Johnson applied for an arrest warrant. At that time, considering the victim had not died, the charge was for attempted second degree murder. After the victim succumbed to his injuries, the charge was upgraded to second degree murder, along with obstruction of justice.

Upon his arrest, defendant's cell phone was taken and a search warrant was obtained for the cell phone. A search warrant was also obtained for the records of T-Mobile, defendant's cell phone service provider. Based on a comparison of the information obtained from defendant's cell phone and the information obtained from T-Mobile's records, it was discovered that defendant deleted from his cell phone the call he made to United Cab on the morning of the murder. Further, once defendant made the call to United Cab, there was no activity from approximately 4:00 a.m. until 9:45 a.m. Detective Johnson testified, based on his experience as a homicide detective, that such a long period of inactivity was "[e]xtremely unusual." However, also based on his experience as a homicide detective, Johnson stated that people who commit crimes often do not use their cell phones during the commission of the crime so that their locations cannot be pinpointed based on the location of the cell phone tower used to transmit their calls.

Despite an exhaustive search of defendant's cell phone, T-Mobile's records, along with defendant's Facebook and Instagram records, Detective Johnson could find no trace of anyone named "Cherry." There were no calls or text messages

7

made or sent to or from her. She was not listed as a contact and no messages to or from her could be found on defendant's Facebook and Instagram accounts. On the morning of the murder, there was no trace of any communication with anyone living in the area where defendant traveled to (7726 Shubrick Avenue). The only phone call from defendant was the call that he deleted made to United Cab requesting a ride to 7726 Shubrick Avenue. Defendant told Detective Johnson that he was in the area where the murder occurred in order to meet a stripper, "Cherry," who he met on Instagram. However, no call was found to or from the stripper and no Instagram message was found to or from the stripper.

Detective Johnson stated that defendant told him about practicing shooting with a handgun a few days before the murder. Defendant practiced with a semi-automatic handgun, the same type of weapon used to shoot the victim.

Jontrice Mims, a pre-kindergarten teacher, testified that she knew defendant and knew the victim, who was her fiancé. She stated that she was in an "on again/off again" relationship with defendant for seven years. During that time they lived together at various residences, one of which was 8015 Trapier Street, the site of the murder. Ms. Mims ended her relationship with defendant in the summer of 2017. Around that same time, she met the victim, Idrick Brister. In September of 2017, she and the victim moved in together at 8015 Trapier Street.

Ms. Mims stated that the end of her relationship with defendant was "bad." He became jealous and aggressive and he acted "like a child." However, in November of 2017, she and defendant had one or two sexual encounters which she was concerned may have resulted in her becoming pregnant. She told the victim about the brief encounters and he forgave her, telling her that "everything was going to be okay" and "we was [sic] just going to deal with it."

8

Ms. Mims confirmed that in January of 2018 the defendant suspected that she was pregnant with his child. She never told him whether she was or was not. In fact, in December of 2017 and January of 2018, she stopped speaking to defendant and that made him angry. She stated that defendant knew she was living with the victim at 8015 Trapier Street.

On January 8, 2018, the date of the murder, the victim left for work and while Ms. Mims was getting dressed, she heard shots fired; first she heard one shot, then two other shots "rang off." Her brother went outside to see what was happening and he told her that the victim had been shot. Ms. Mims called 911, reporting the shooting and identifying the victim.[1]

The following day, she spoke with the detective investigating the shooting and because she "figured that Chris [defendant] had … reason to do this … I [told] the man that I thought it was [Chris]."

Defendant was familiar with 8015 Trapier Street having lived there earlier with Ms. Mims. While they lived there together, defendant mentioned that he had relatives that lived around the corner on Shubrick Avenue. Ms. Mims stated that on occasion, she would "pick up" people related to defendant who lived on Shubrick Avenue. During their time together, Ms. Mims never witnessed defendant handling a gun. He never spoke about getting a gun and never went to a range to practice shooting a gun.

**DISCUSSION**

Our review of the record in this matter indicates that there are no errors patent.

---

[1] Ms. Mims's 911 call was introduced into evidence as state's exhibit 44 and played for the jury.

9

Defendant contends the state presented evidence insufficient to sustain his convictions. With respect to his second degree murder conviction, defendant asserts the evidence presented at trial was circumstantial and failed to prove his identity as the assailant. As for the obstruction of justice conviction, defendant argues that the state failed to prove that he tampered with evidence with the requisite intent to distort the results of a criminal proceeding or investigation.

The standard of review for a claim of insufficiency of the evidence was laid out by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979):

> …the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. (Emphasis in original).

"Under the *Jackson* standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court." *State v. Williams*, 2011-0414, p. 18 (La. App. 4 Cir. 2/29/12), 85 So.3d 759, 771. Further, "a factfinder's credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence." *Id.* But where there is no direct evidence presented proving one or more of the elements of the offense, La. R.S. 15:438 governs circumstantial evidence and provides "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." "Stated differently, '[t]he reviewer as a matter of law, can affirm the conviction only if the reasonable hypothesis is the one

10

favorable to the state and there is no extant reasonable hypothesis of innocence.'" *State v. Green*, 449 So.2d 141, 144 (La. App. 4 Cir. 1984) (citing *State v. Shapiro*, 431 So.2d 372 (La. 1983)). "This test is not separate from the *Jackson* standard; rather it simply requires that 'all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt.'" *State v. Hoang*, 2016-0479, p. 3 (La. App. 4 Cir. 12/21/16), 207 So.3d 473, 475 (quoting *State v. Ortiz*, 96–1609, p. 12 (La. 10/21/97), 701 So.2d 922, 930). If a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis falls; and, unless another one creates reasonable doubt, the defendant is guilty. *See State v. Captville,* 448 So.2d 676 (La. 1984).

"A reasonable alternative hypothesis is not one 'which could explain the events in an exculpatory fashion,' but one that 'is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.'" *State v. Mack*, 2013-1311, p. 9 (La. 5/7/14); 144 So.3d 983, 989 (quoting *State v. Captville*, 448 So.2d 676, 680 (La. 1984)). Therefore, "where the evidence is purely circumstantial, if it does not exclude every reasonable hypothesis of innocence, a rational juror cannot find defendant guilty beyond a reasonable doubt without violating constitutional due process safeguards." *State v. Monds*, 631 So. 2d 536, 539 (La. App. 4 Cir. 1994).

In *State v. Davis,* 637 So.2d 1012, 1020 (La. 5/23/94), the Louisiana Supreme Court explained:

> In circumstantial evidence cases, this court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, this court, evaluating the evidence in the light most favorable to the prosecution, determines whether the possible alternative hypothesis is sufficiently **reasonable** that a rational juror could not have found proof of guilt beyond a reasonable doubt under *Jackson v. Virginia,* 443 U.S. 307,

11

99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). La. R.S. 15:438; *State v. Captville,* 448 So.2d 676, 678 (La.1984); *State v. Rosiere,* 488 So.2d 965 (La. 1986). [Emphasis original.]

**Second Degree Murder**

Pursuant to the provisions of La. R.S. 14:30.1, to find defendant guilty of second degree murder, the state was required to show that defendant killed the victim with the specific intent to kill or to inflict great bodily harm. In the case at hand, defendant contends that the circumstantial evidence submitted by the state failed to prove his identity as the killer.

Defendant makes much of the evidence demonstrating that he admitted to being in the area at the time of the shooting. However, defendant acknowledged his presence only upon direct questioning by Detective Johnson regarding his whereabouts at the time of the shooting. Though defendant admitted to taking a cab to Shubrick Avenue (close to where the victim was shot), he initially attempted to conceal this information by deleting his cell phone record of this call. The call was discovered only after police obtained the records from defendant's cell phone provider, T-Mobile, which reflected the call. Moreover, the reasons he provided for being in the area at the time of the murder were unbelievable.

Defendant stated that he went to the area to meet a stripper, "Cherry," that he met on Instagram. However, a search of defendant's Instagram account, along with his Facebook account and cell phone records, reflected no communication between defendant and "Cherry." Defendant argues that the lack of evidence of his being in contact with "Cherry" was not sufficient to demonstrate that his reason for being in the area at the time was fabricated because investigators failed to search "other apps in existence that can be used for contacting another individual…." However, Detective Johnson testified that defendant stated that he

12

met "Cherry" on Instagram. It is logical that this "app" would have reflected any communication between the two. The defendant's speculative, "far-fetched account" for why he was in the area where the murder took place was not credible.

Defendant also challenges the state's theory that the motive behind the shooting was jealousy. As an initial matter, motive is not an essential element of murder though a lack of motive may be considered as a circumstance mitigating against specific intent. *State v. Tucker,* 2013-1631, p. 56 (La. 9/1/15), 181 So.3d 590, 630; *State v. Caliste,* 2012-0533, p. 10 (La. App. 4 Cir. 9/4/13), 125 So.3d 8, 14. In any event, in this case, ample evidence of motive was provided.

The state presented evidence demonstrating that defendant was heartbroken when his girlfriend, Jontrice Mims, ended their relationship. The state introduced defendant's Instagram record (state's exhibit 8-A), reflecting defendant's messages, sent to Ms. Mims shortly before the murder, indicating that he was hurt because he believed she had simply used him for sex. He also accused her of lying when she stated that she loved him and not the victim. Defendant conveyed his anger that Ms. Mims had moved on, stating: "But now since this new nigga [the victim] came in your life he gets the you I been dying to have." Based upon these messages, a reasonable factfinder could determine that defendant possessed motive, believing that if the victim was no longer in the picture, he might reunite with Ms. Mims, who he was "dying to have." Further, Mims testified that defendant was angry at the time of the murder because she had stopped speaking to him.

The state was also able to negate the likelihood that robbery was the motive because the victim's wallet, containing a substantial amount of money, was not taken. Thus, contrary to defendant's insinuation that the evidence of motive was

13

weak, the evidence was, in fact, persuasive. Defendant offers no alternative as far as a motive is concerned. Instead defendant simply states "that robbery and jealousy are not the only two motives that exist for murder."

More evidence supporting the jury's finding that defendant was the shooter was his familiarity with the area, specifically, the residence (8015 Trapier Street) where the murder took place. Defendant was intimately acquainted with the residence because he had lived there with Ms. Mims. Further, defendant knew that was where Ms. Mims and her fiancé, the victim, were living at the time of the murder. Having lived in the home, defendant would have been aware of the alleyway on the side of the house which would allow him access to the residence without having to drive a vehicle on the street, thereby avoiding a surveillance camera located at 8015 Trapier Street. Further evidence that defendant gained access to the residence via the alleyway was the muddy footprint found in the alleyway.

As this Court stated in *State v. Wolfe,* 1998-0345, p. 8 (La. App. 4 Cir. 4/21/99), 738 So.2d 1093, 1098:

> When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common expertise. *State v. Shapiro,* 431 So.2d 372 (La.1982).

The Court added:

> This is not a separate test from *Jackson,* but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. *State v. Wright,* 445 So.2d 1198, 1201 (La.1984); *State v. Addison,* 94–2431, p. 6 (La. App. 4 Cir. 11/30/95), 665 So.2d 1224, 1228.

In this case, the circumstantial evidence discussed above proved collateral facts and circumstances from which the existence of the primary fact, that

14

defendant was the shooter, could be inferred according to reason and common expertise. The state showed that defendant was jealous that Ms. Mims was in a relationship with the victim. Further, defendant was in the area, an area he was very familiar with, where the murder took place. His account that he was there to meet a stripper was far-fetched and clearly not supported by competent evidence. Viewing the circumstantial evidence in a light most favorable to the prosecution, a rational trier of fact could have found that the state proved defendant's identity as the killer. Defendant's claim that the state presented insufficient evidence to support his second degree murder conviction is without merit.

**Obstruction of Justice**

La. R.S. 14:130.1(A)(1)(a) and (b) pertinently define obstruction of justice as follows:

A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as described in this Section:

(1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:

(a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or U.S. law enforcement officers; or

(b) At the location of storage, transfer, or place of review of any such evidence.

La. R.S. 14:10(1) defines specific criminal intent as follows: "[T]hat state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."

15

"'Specific intent [to commit obstruction of justice] need not be proven as fact but may be inferred from the circumstances of the transaction and the actions of defendant.'" S*tate v. Scott,* 2023-0022, p. 15 (La. App. 4 Cir. 8/30/23), 372 So.3d 42, 54, *writ denied,* 2023-01317 (La. 3/19/24), --- So.3d ---, (quoting *State v. Harvey,* 2021-0730, p. 10 (La. App. 4 Cir. 5/25/22), 345 So.3d 1043, 1050, *writ denied,* 2022-00953 (La. 9/20/22), 346 So.3d 803) (citation omitted).

As the state points out, there are two bases to support a finding that defendant obstructed justice. One such basis is that the semi-automatic gun used to shoot the victim was not recovered from the crime scene. The state argues that the failure to recover the weapon from the crime scene "indicates that [defendant] took the gun with him after shooting [the victim] and likely disposed of it so that it could never be found." The state further argues "[t]his act of taking the gun away from the crime scene and ensuring that it never gets recovered alone is sufficient to support a conviction for obstruction of justice."

While asserting that evidence reflecting that the murder weapon was not recovered from the crime scene, by itself, is sufficient to support an obstruction of justice conviction, the state acknowledges that a recent decision from this Court "does not lean in its favor." Indeed, this Court, in *State v. Scott,* 2023-0022, p. 16 (La. App. 4 Cir. 8/30/23), 372 So.3d 42, 55, *writ denied,* 2023-01317 (La. 3/19/24), --- So.3d ---, held just the opposite. In *Scott*, as in this case, there was no surveillance video showing the defendant leaving the scene with a weapon and there were no witnesses who testified that they saw the defendant leave the scene with a weapon. The Court concluded, however, that even if such evidence existed, it would not be sufficient "to prove beyond a reasonable doubt that [the defendant] possessed the specific intent to distort the police investigation." *Id.* According to

16

the state's argument (which includes that *Scott, supra,* was wrongly decided), any time that circumstantial evidence demonstrated that an assailant failed to abandon a weapon used during the commission of an offense at the scene of the crime, adequate proof would exist to support an obstruction of justice conviction.

In this case, *Scott* notwithstanding, the state presented additional evidence of obstruction. There is no question, based on a comparison of defendant's cell phone logs and T-Mobile's call detail records, that defendant deleted the record of the call he made to the cab company requesting to be transported to the area where the murder occurred. Defendant seeks to minimize the significance of his action in deleting the record of the call by noting that during questioning by Detective Johnson, he volunteered the information that he had called a cab during the early morning hours of January 8, 2018. Defendant contends that because he volunteered the information reflecting that he travelled to the area, it negated any circumstantial proof that he intended to obstruct justice. However, defendant confessed to calling the cab company only when questioned by Detective Johnson regarding his whereabouts in the early morning hours of January 8, 2018. A rational juror could have concluded he was attempting to destroy evidence when he deleted the call. Once he was contacted by police and came under questioning about the murder, he admitted making the call. At that point, the information that he was in the area where the murder took place had been ascertained by a review of T-Mobile's records. Defendant knew police would discover where he was and decided to "come clean." There was no rational explanation for defendant deleting that particular call, the only call deleted by defendant on January 8, 2018, other than his desire to conceal his whereabouts so as to impede the criminal investigation. Thus, viewing the evidence in a light most favorable to the

17

prosecution, a rational juror could have found defendant guilty of obstruction of justice based upon his concealment of his whereabouts at the time of the murder. Defendant's claim that there was insufficient evidence to support his obstruction of justice conviction lacks merit.

## CONCLUSION

For the above and foregoing reasons, defendant's convictions and sentences for second degree murder and obstruction of justice are affirmed.

**CONVICTIONS AND SENTENCES AFFIRMED**